199 So.2d 210 (1967)
John J. PENN
v.
INFERNO MANUFACTURING CORPORATION et al.
No. 6946.
Court of Appeal of Louisiana, First Circuit.
April 17, 1967.
Dissenting Opinion April 17, 1967.
Rehearing Denied May 29, 1967.
*211 Carl J. Schumacher, Jr., of Lemle & Kelleher, Peter H. Beer, of Montgomery, Barnett, Brown & Read, New Orleans, for appellant.
John L. Lanier, of Pugh, Lanier & Pugh, Thibodaux, for appellees.
Before LOTTINGER, REID and SARTAIN, JJ.
LOTTINGER, Judge.
This case involves a personal injury claim wherein the plaintiff, Mr. John J. Penn, of Houma, Louisiana, was injured as a result of an explosion of a sight glass which was installed on a fluid level gauge of a high pressure separator unit which was being used to test an oil well in Lafourche *212 Parish on June 9, 1962. Mr. Penn was the major stockholder and manager of Testers, Inc., a corporation engaged in the oil field well testing business.
In the early part of June, 1963, the plaintiff, Mr. Penn, retained counsel and on June 7, 1963, suit was filed for Mr. Penn's personal injuries against Inferno Manufacturing Corporation, Republic Supply Company and Joe Teuton, dba Teuton Specialty Company. Believing that Inferno Manufacturing Corporation manufactured the gauge sight glass, it was alleged that Inferno Manufacturing Corporation negligently manufactured the sight glass and that Inferno warranted that the sight glass was free from defects. Plaintiff's suit further alleged that Inferno sold the sight glass to Republic and that Republic warranted to the plaintiff that the sight glass was free from defects and alternatively that Republic negligently sold a defective glass to Mr. Penn. In the further alternative, it was alleged that Joe Teuton, dba Teuton Specialty Company, sold the glass to Mr. Penn, warranting that it was free from defects and alternatively that Teuton negligently sold a defective glass to Mr. Penn.
After suit was filed, Inferno Manufacturing Corporation filed an answer and third party petition and in it alleged that it did not in fact manufacture the sight glass which was involved in the accident but that said sight glass was manufactured by Corning Glass Works of Corning, New York, for them. Corning Glass Works is insured by Insurance Company of North America. Corning Glass Works, however, was never served, but their insurer, Insurance Company of North America was served and made an appearance.
In due course, various interrogatories were propounded by Insurance Company of North America to Inferno Manufacturing Corporation, and these interrogatories were answered by Inferno Manufacturing Corporation who stated that they acquired all of their sight glasses from Corning Glass Works. Thereafter, on March 17, 1965, plaintiff filed a supplemental and amending petition alleging that Inferno Manufacturing Corporation and/or Corning Glass Works manufactured the glass and prayed for judgment in solido against these defendants along with Republic Supply Company and Joe Teuton, dba Teuton Specialty Company and against Corning and Insurance Company of North America. Corning was never served and thus never became a party to the suit.
The case was tried on the merits and consumed four days of trial. After the case was submitted and briefs filed by all parties except Insurance Company of North America, then, for the first time, INA filed an exception of prescription. Supplemental briefs were filed on the exception of prescription and after the filing of these supplemental briefs, the Trial Judge rendered judgment in favor of plaintiff, Mr. John J. Penn, for $322,041.85, and against INA and Inferno, jointly and in solido, and further gave judgment in favor of Inferno on its third party demand which it had brought against INA for indemnity. Judgment was rendered in favor of defendants, Republic Supply company and Joe Teuton, dba Teuton Specialty Company, dismissing plaintiff's suit against them.
Appeals have been taken by INA and by Inferno Manufacturing Corporation. No appeals have been taken from the judgment in favor of Joe Teuton, dba Teuton Specialty Company and Republic Supply Company. Plaintiff and appellee, John J. Penn, however, has answered the appeals of Inferno and INA and asked that the judgment be increased from the sum of $322,041.85 to the sum of $350,784.22, together with interest from date of judicial demand and for all costs.
Defendants set forth the following specifications of error:
I. The trial court erred in failing to sustain appellant's plea of prescription.

*213 II. The trial court erred in holding that the gauge glass was defective.
III. The trial court erred in holding that the explosion was caused by a defective gauge glass.
IV. The trial court erred in holding that the plaintiff's injuries and entire physical condition were caused by the explosion.
V. The trial court erred in awarding the plaintiff the excessive sum of $322,041.85.

1. PRESCRIPTION
On the plea of prescription, counsel for plaintiff has furnished us with a splendid statement and research of the law and for that reason we adopt same as our own.
"As previously pointed out, it was only after the case had been completed, briefs ordered by the Court and briefs filed by all parties with the exception of INA that INA sought, for the first time, to raise the question of prescription. It should be noted in the supplemental and amending petition filed herein by plaintiff that the plaintiff, Mr. Penn, amended his original petition by praying for judgment in solido against INA, Inferno and the other defendants. It is well settled under Louisiana Law that prescription against a tortfeasor who is not sued within the year is interrupted when this tortfeasor is liable jointly and in solido with a tortfeasor who has been timely sued. There is no question, certainly, but that suit was timely filed against Inferno, and the first and basic issue presented as to the question of prescription is whether or not Inferno and INA are joint tortfeasors. The Trial Judge found that Inferno and INA were joint tortfeasors. Appellant, INA, now argues that appellee is `grabbing at interruption-of-prescription straws' because of the argument that Inferno is a joint tortfeasor along with INA, because Inferno labeled the product as its own and held itself out to be the manufacturer of the sight glass. Appellant, INA, contends `There was never an allegation of such a holding out, and the record is bare of any evidence that Inferno in fact ever held itself out as the manufacturer.'
We particularly wish to point out to the Court that at the time suit was filed, petitioner believed the sight glass which was the subject of the suit to be manufactured by Inferno Manufacturing Corporation. The sight glasses themselves, which are introduced into evidence bear markings identifying them as being manufactured by Inferno Manufacturing Corporation, and it was not until after filing the suit and answers were filed and interrogatories answered that there was any indication at all that the glass was made by Corning Glass Works (who is insured by Insurance Company of North America). In addition, Insurance Company of North America (on behalf of Corning Glass Works) denied having manufactured the glass and seriously contested the question of manufacturing the glass on the trial of the case and tried to establish that the glass which had been sold to Mr. Penn had been manufactured by some foreign source. It appears that after the fact became apparent that the glass which was involved in the explosion was manufactured by Corning that Insurance Company of North America decided to come in and file an exception of prescription in an attempt to avoid liability.
First let us examine what evidence the record contains indicating that Inferno held itself out as the manufacturer of the sight glass or glasses which are the subject of this case. First of all, there are the remaining sight glasses which had been purchased by the plaintiff, Mr. John Penn, which have been identified in evidence as Exhibits "P-2" and "P-20". These sight glasses which were introduced in evidence were, of course, not the one which exploded and seriously injured Mr. Penn, but they have been idntified in Mr. Penn's [Penn's] deposition as being the remaining sight glasses which Mr. Penn acquired from *214 Republic Supply Company during the month of February, 1962. An examination of these sight glasses, Exhibits "P-2" and "P-20", show that they bear markings on one side thereof of "Inferno Special Alkaline" and on the other side thereof "Shreveport, La. U.S.A. Patent 3-25-24". We also ask the Court to look at part of Exhibit "P-2" which is the box containing one of the sight glasses. On the box is a label which says "Inferno Company, Shreveport 90, La." If this is not holding out by Inferno and labeling by them that they are the manufacturer of the product, then what is?
There is further evidence that Inferno held itself out as the manufacturer of the sight glasses. We call the Court's attention to the invoices filed in evidence as Exhibit "P-10" and "P-11" wherein Mr. Penn was billed for the purchase of certain sight glasses. Exhibit "P-10" shows that in December of 1959, Testers, Inc. (Mr. Penn's company) acquired two S-14 Special Alkaline Glasses for Inferno Special Type reflex gauge. Exhibit "P-11" is an invoice of Republic Supply Company bearing No. 38319 which shows an order dated February 19th of 1962 by Mr. Penn for four S-4 reflex gauge glasses with gaskets for an Inferno Liquid Gauge.
It should be noted that nowhere on either the sight glasses, the label on the box, or any of the invoices or orders for sight glasses is there any indication that they were manufactured by anyone other than Inferno. We submit the record clearly indicates that Inferno most certainly did hold itself out as the manufacturer of this product.
We submit that it is a fundamental rule of law that knowledge of the defective qualities in a thing sold can be imputed to the manufacturer thereof thereby justifying and awarding damages against the manufacturer. We will, in a later portion of this brief, cite numerous authorities in support of this general rule. We further recognize that as a general rule the courts of this state have refused to impute such knowledge to a vendor who is not also the manufacturer of the article.
We submit, however, that there is an exception to this last rule which allows knowledge to be imputed to a seller or dealer who is not also the manufacturer of the article when the seller or dealer has labeled the goods as his own or has in some way held the goods out to be manufactured by him. See Vol. XXIV Louisiana Law Review, page 200. Various common law states have already adopted this view.
In Volume 65 of Corpus Juris Secundum [Negligence § 100(3)], at page 633 [1106] the following language is found:
`Vendor holding himself out as manufacturer. One who puts out or sells as his own product a chattel manufactured by another is subject to the same liability as the manufacturer for damages caused by dangerous defects therein as the result of negligence in its fabrication or lack of proper inspection.'
citing:
Conn.-Burkhardt v. Armour & Co., 161 A. 385, 115 Conn. 249, 90 A.L.R. 1260.
Ill.-Lill v. Murphy Door Bed Co. of Chicago, 8 N.E.2d 714, 290 Ill.App. 328.
Mo. [Md.]-Armour & Co. v. Leasure, 9 A.2d 572, 177 Md. 393.
Miss.-Swift & Co. v. Hawkins, 164 So. 231, 174 Miss. 253.
N.J.-Slavin v. Francis H. Leggett & Co., 177 A. 120, 114 N.J.Law 421, affirmed 186 A. 832, 117 N.J.Law 101.
N.Y.-Poplar v. Bourgois, Inc., 80 N.E. 2d 334, 298 N.Y. 62-Gittelson v. Gotham Pressed Steel Corporation, 42 N.Y.S.2d 341, 266 App.Div. 866. Auld v. Sears, Roebuck & Co., 25 N.Y.S.2d 491, 261 App.Div. 918, *215 affirmed 41 N.E.2d 927, 288 N.Y. 515.
Ohio-Dow Drug Co. v. Nieman, 13 N.E. 2d 130, 57 Ohio App. 190.
Tex.-S. Blockman [Blickman], Inc. v. Chilton, Civ.App., 114 S.W.2d 646.
U.S.-Carney v. Sears, Roebuck & Co., C.A.Va., 309 F.2d 300.
Ala.-Sears, Roebuck & Co. v. Morris, 136 So.2d 883, 273 Ala. 218.
Fla.-King v. Douglas Aircraft Co., App., 159 So.2d 108.
Particularly we would like to call this Court's attention to the case of Carney v. Sears, Roebuck and Co., 309 F.2d 300 (1962) U.S. Court of Appeal, Fourth Circuit, wherein this problem was squarely considered by a Federal Appellate Court. The Carney case, supra, was one wherein the claimant Carney purchased a "Workmaster" ladder from Sears, Roebuck and Co. The Court pointed out that `Workmaster' was the trade name used by Sears. While plaintiff was using the ladder, it collapsed and suit was brought alleging that there was faulty construction. The U.S. Fourth Circuit Court of Appeal noted in its reasons for judgment, the following:
`The undisputed evidence in the record shows that the defendant was not the manufacturer of the ladder. The ladder was manufactured by the J. R. Clark Company of Minnesota, but the name of the manufacturer does not appear at any place on the ladder and the defendant's name appears on the label attached to the ladder. There was no indication either about the merchandise or in the newspaper that anyone other than the defendant had anything to do with this product.' Supra, at 302.
In reasoning that Sears be held responsible, the Court cited with approval the following language from the Restatement of the Law of Torts, Vol. 2, Sec. 400, comment c.
`One who puts out as his own product chattels made by others is under a duty to exercise care, proportionate to the danger involved in the use of the chattels if improperly made, to secure the adoption of a proper formula or plan and the use of safe materials and to inspect the chattel when made. But he does not escape liability by so doing. By putting a chattel out as his own product, he causes it to be used in reliance upon his care in making it. Therefore, he is liable if, because of some negligence in its fabrication or through lack of proper inspection during the process of manufacture, the article is in a dangerous defective condition which the vendor could not discover after it was delivered to him.' (Italics ours.) Supra at 304.
The Court commented further on the basis of its ruling as follows:
`The basis of the rule is that where the vendor puts only its name upon the product without indicating that it is actually the product of another then the public is induced by its reasonable belief that it is the product of the vendor to rely upon the skill of the vendor and not upon the skill of any other.' Supra, at 304.
As previously pointed out in this instance we feel that the record is abundantly clear that Inferno marked and sold as its own product the sight glasses which were in fact manufactured for them by Corning Glass, and we submit that under the above line of authority they should be held jointly liable as a result of the damages which Mr. Penn sustained.
Even if Inferno is considered a dealer of the sight glasses for Corning Glass, under further authority Inferno can be held liable under this rule imposing liability for representing themselves as the manufacturer of the product.
*216 Again in Volume 65 of Corpus Juris Secundum at page 637 [1114] the following language is found:
`Dealer representing himself as manufacturer. In accordance with the general rule imposing on a dealer holding himself out to be the manufacturer of an article the same liability as is imposed on a manufacturer for defects in the article, as discussed supra subdivision c(1) of this section, a dealer who so holds himself out is liable for defects which he could have discovered by proper inspection and tests.'
citing:
Ill.-Lill v. Murphy Door Bed Co. of Chicago, 8 N.E.2d 714, 290 Ill.App. 328.
U.S.-Carney v. Sears, Roebuck & Co., C.A.Va., 309 F.2d 300.
Counsel for appellant, INA relies strongly on the case of Coignard v. F. W. Woolworth & Co., 175 So. 123, (Orleans Appeals, 1937) and submits that it clearly exonerates Inferno from liability in this instance. A reading of the Coignard case, supra, will reveal that in it a parent brought suit on behalf of her minor daughter against Woolworth as a retailer for damages caused by injury to the daughter resulting from the use of a defective toothbrush which the daughter had purchased from Woolworth. A reading of the case reveals that in the plaintiff's petition she alleged that she purchased a "Superfine" toothbrush from Woolworth, which toothbrush, according to the label thereon was made in Japan. The plaintiff then further alleged that the toothbrush was defective, etc., and that certain injuries were sustained by her daughter. Plaintiff contended that Woolworth should be held liable since it was impossible to sue the manufacturer. Exceptions were filed and the suit was dismissed when the exceptions filed by the defendant were maintained.
It is clear, therefore, that in the Coignard case, supra, there was absolutely no mislabeling of the product, nor any holding out by Woolworth that it was the manufacturer of the toothbrush. In dismissing the plaintiff's suit, the Orleans Court of Appeal refused to follow certain common law jurisprudence to the effect that the sellers of certain foods were held liable although they did not manufacture or prepare the food. The Orleans Court of Appeal cited specific articles of the Louisiana Civil Code which clearly state the general rule that the vendor of a product who has no knowledge of a vice or defect in the product is not liable for damages caused by the vice or defect. The Coignard case, supra, is clearly distinguishable from the present case. Here, Inferno has represented itself as the manufacturer of the product and therefore under the exception to the general rule knowledge of the defect in the product can be imputed to them.
Counsel for defendant and appellant, Inferno Manufacturing Corporation also cites the Coignard case, supra, and in addition thereto cites Hurley v. J. C. Penny Company, 140 So.2d 445 [La.App.], First Circuit (1962) and Boyd v. J. C. Penny Company, 195 So. 87 [La.App.], First Circuit (1940). We submit that a reading of these two cases will also readily disclose that they enunciate the same rule found in the Coignard case, namely, that the ordinary vendor of a product who has no knowledge of a vice or defect in the product is not liable for damages. Neither the Hurley case, supra, nor Boyd case, supra, should lend appellants any comfort, however, since in neither instance is there any evidence that there was any mislabeling or holding out by the defendants that the product was their own. In the Hurley case, supra, the Court of Appeal stated that the lawn mower which was allegedly a dangerous instrumentality, was not manufactured by J. C. Penny Company and the Court commented that there was no evidence whatsoever in the record that the mower was in any way improperly designed nor was *217 there any evidence to show that there was a defect or vice in the mower. In the Boyd case, supra, the plaintiff sought to recover for damages caused by a dress which allegedly contained a dye which caused an irritation to her skin. There is absolutely nothing in the decision to maintain that J. C. Penny in any way held out the dress to be its own, and the Court pointed out that the defendant, J. C. Penny Company, did not have any reasonable means of knowing or ascertaining before the dress was sold that it contained any injurious substances.
The situation is considerably different in the instant case, however, where the record clearly reflects that Inferno Manufacturing Corporation placed their label upon this product which was a component part of a gauge which they manufactured. The record abundantly reflects that the Inferno gauge is well known in the oil fields of South Louisiana and Inferno, in placing their label upon the gauge and the sight glass, has held itself out to be the manufacturer or maker of the product. The very fact that the sight glasses were labeled with Inferno's name is even more misleading because Inferno was so well known in the oil fields as being a manufacturer of oil field equipment. The cases involving J. C. Penny and Woolworth do not present such a situation. It should be also remembered that Corning Glass denied that they manufactured the sight glass that exploded causing Mr. Penn's injuries. In fact, the testimony of Mr. A. G. Blanchard, the President of Inferno Manufacturing Corporation, will reflect that he was questioned extensively by the attorneys for Insurance Company of North America (the insurer of Corning Glass) as to whether Inferno had ever poured any glass in their own molds which had been returned to them by Corning and was also questioned regarding whether Inferno had ever purchased any glass from foreign sources. The testimony of Mr. Blanchard clearly shows that the molds had been returned to Inferno Manufacturing Corporation by Corning Glass for some period of time. Apparently, therefore, the molds belonged to Inferno and certainly Inferno must be considered as a party to the manufacturing process when the glass is poured and cast in their molds. Certainly Inferno is bound up in the manufacturing process of the glass as well as the gauge, with both products having the name of Inferno Manufacturing Corporation prominently displayed and represented to the public as being Inferno's product. We respectfully submit that such actions clearly call for an application of the jurisprudence hereinabove cited, which cases provide an exception to the general rule and allow knowledge of a vice or defect to be imputed to a seller who is not also a manufacturer of the article when the seller has labeled the goods as his own or has in some way held them out to be manufactured by him.
It is further submitted that the various code articles cited in the Coignard case which has been relied on by counsel for appellants are not applicable in the instant case, since it should be apparent from a reading of these articles that they do not contemplate a situation where a vendor has held out a product which he did not manufacture to be his own. Public policy should not encourage the mislabeling of products. In fact, such actions are frowned upon in our law since there are various statutes and regulations concerning the issuance of patents, trade marks, trade names, copyrights, and the like, all of which are designed to help protect the public. (See for example, 15 U.S.C.A. 1125, which permits a civil action for damages sustained by any person damaged by the result of falsely describing or representing a product.) This case, we submit, exhibits the most logical reason why the common law rules which hold a dealer or vendor liable for the mislabeling of a product should be adopted in Louisiana.
Even if the mislabeling and holding out by Inferno that they were the manufacturer of the sight glasses was not sufficient in *218 itself, then we ask that the Court further consider the fact that the undisputed testimony of Mr. A. G. Blanchard, the President of Inferno Manufacturing Corporation, shows that the molds in which these glasses had been cast belonged to Inferno. Particularly, we wish to call the Court's attention to the following testimony which was elicited by counsel for INA during his cross-examination of Mr. Blanchard.
`Q. Sometime in the 1950's your company, Inferno, asked Corning Glass Company to return to you their molds for this size proprietary gauge glass, that is, the molds that had your Inferno sign on them and the special alkaline or Inferno, Shreveport, Louisiana, on them?
A. Yes, I remember that, but I don't remember if it was this particular size or not because they have a number of our molds.
Q. Why did you want the molds back?
A. We were considering making the glasses ourselves.
Q. What was done with the molds when you had them?
A. We kept them for about a year and then I think we sent them back to them.
Q. You were going to make some glass yourself?
A. Yes.
Q. How far along did you get in that process?
A. Just thinking about it.
Q. You never got it off the thinking stage?
A. No.
Q. You never did anything to the mold? Didn't you try to fill the molds with glass once or twice?
A. No.'
(Transcript pages 379, 380)
Certainly, Inferno must be considered as a party to the manufacturing process for the sight glasses when the sight glasses were poured and cast in their molds. How the defects or `bubbles' got into the sight glasses during the manufacturing process is not known by Appellee. This knowledge is particularly within the knowledge of defendants and appellants. It just could be that the `bubbles' resulted from faulty or defective molds which are apparently owned by Inferno. For that reason alone Inferno should be considered as party to the manufacturing process and held liable in solido as a manufacturer.
Counsel for appellant, INA, contends that the law of prescription is based upon sound public policy and is favored in the law and further contends that ignorance of one's rights will not prevent the tolling of prescription. (See brief of appellant, INA, page 6). We submit that the jurisprudence of the State of Louisiana indicates that our Courts have for years taken a very liberal approach to the application of the law of prescription. As an example of the more liberal approach adopted by our courts, we particularly wish to call this Court's attention to the comments in the Louisiana Law Review regarding the decision of the Louisiana Supreme Court in the case of National Surety Corp. v. Standard Accident Insurance Co. [247 La. 905], 175 So.2d 263 (1965). In the National Surety Corporation case, supra, defendant had filed a prescription of one year which had been sustained in both the Trial Court and the Court of Appeal. The Supreme Court reversed.
`The Supreme Court, speaking through Justice Hamlin, took a completely different approach to the problem, which it solved through a broad and liberal interpretation *219 of the statute relating to the interruption of prescription by suit. The statutory language which it found pertinent reads as follows:
`All prescriptions affecting the cause of action therein sued upon are interrupted as to all defendants, * * * by the commencement of a civil action in a court of competent jurisdiction and in the proper venue.'
The Supreme Court pointed out that while the intervener's demand was different from that of the original defendant, both demands were based on the same cause of action; and, consequently, the plaintiff's suit interrupted the running of prescription against the common cause of action.'
(Louisiana Law Review, Vol. XXVI, Pages 587, 588)
We further submit that the law of Louisiana is clear that prescription does not run against one without knowledge of the existence of facts which would entitle him to bring a suit against the proper defendant. The Supreme Court of Louisiana in 1939 in the case of Walter v. Caffall [192 La. 447], 188 So. 137, clearly sets forth this rule in the following language:
`The record in this suit shows that the plaintiffs had never been put on notice of any of these facts and had apparently no reason to make any special search of the records; that they had no knowledge or information as to the facts; that none of the defendants ever disclosed any of these facts to them, nor had any one else ever called their attention to these facts. This Court is of the opinion that the plaintiffs under the circumstances disclosed in this record come within the rule that prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring a suit, when such ignorance is not wilful and does not result from negligence. Simply because these facts may have been obtained at a particular place or in a particular manner, and the plaintiffs did not happen to make a search in that particular place and especially since they had never been put on notice and were wholly ignorant of the existence in any place of the facts upon which to base an action, this Court does not think their ignorance is wilful nor the result of any negligence on their part.' Supra, at page 143. (Italics ours)
The Walter case, supra, has been cited with approval by the Second Circuit Court of Appeal in the case of Youngblood v. Burke [La.App.], 43 So.2d 695, 698, and we also ask the Court to note the case of Perrin v. Rodriguez, 153 So. 555, Orleans Court of Appeal (1934) wherein the following language is found:
`A defendant who either intentionally or unknowingly `succeeds in concealing from a creditor his cause of action cannot be allowed to reap the benefit of his own wrong.' (Syllabus No. 3). Hyman v. Hibernia Bank & Trust Company et al. 139 La. 411, 71 So. 598. See, also, Bernstein v. Commercial National Bank, 161 La. 38, 108 So. 117.' Supra, at page 556.
Under the circumstances we submit that prescription in this instance should be held interrupted since Inferno misled plaintiff and appellee, John Penn, by labeling the sight glasses as their own. It is not difficult to understand why Mr. Penn or his attorneys should be misled into believing that the sight glasses were made by Inferno when they had Inferno's name stamped upon them, when they were packaged in a box with Inferno's label upon them, when they were purchased with invoices showing them as Inferno's sight glasses, and when they were a component part of a gauge manufactured by Inferno. In fact, even the name Inferno Manufacturing Corporation infers that Inferno was the manufacturer and no one had any reason to doubt that Inferno was the manufacturer of the sight glasses when their name was prominently *220 displayed on the gauge, glasses, labels and invoices.
Nowhere on any invoice or gauge or glass was any information available that the sight glasses were made by Corning. In fact, the first knowledge that appellee had that Corning was involved was the filing of the third party petition by Inferno setting forth that Corning had manufactured the sight glasses. It should be remembered that Corning denied the manufacturing of these sight glasses and strenuously cross-examined Mr. Blanchard, the President of Inferno, in an attempt to establish that Inferno had manufactured the glasses in Inferno's molds.
We submit that the law should not allow the manufacturer of a product to mislead the public by the improper labeling of the product. In this instance, Mr. Penn should not be deprived of his right of action against INA (the insurer of Corning) by the tolling of the statute of prescription when, through concealment and deliberate mislabeling, he was led to believe that Inferno was the manufacturer of the product which caused him injury.
* * * * * *
"We would now like to review the law concerning the duty, responsibility and liability of the manufacturer and seller of the product such as the sight glass in question. In Louisiana the early case of Doyle v. Fuerst et al., 129 La. 838, 56 So. 906 [40 L.R.A., N.S. 480], is a leading case dealing with the duty, obligation and liability of a manufacturer. In the Doyle case, supra, plaintiff suffered ptomaine poisoning from having eaten cakes made at the establishment of the defendant. After discussing the duty, responsibility and liability of the manufacturer of the product, the Court held the defendant liable and stated in their reasons for judgment citing from previous cases and the early authorities:
`But there is an hypothesis under which the purchaser will not be required to make this proof' (the proof that the vice was apparent, or that the vendor had knowledge of it). `It is where, by reason of the profession which he exercises, the vendor should have known even the hidden defects of the things he sells.

`Thus, even though the vendor was ignorant of the vices of the thing sold, if by his profession he was bound to know them, he is in fault and ought to indemnify the purchaser for the damage suffered; good faith does not exclude incompetency.' Doyle case, at page 844 [56 So. at page 908]. (Italics ours)
* * * * * *
`However, it is generally conceded that the vendor is presumed to know the vices of the thing sold when he is a workman or manufacturer selling the things of his own fabrication; he ought to know their defects, and, if he makes the sale without revealing these defects to the purchaser, he ought to repair the damage which the latter may suffer therefrom; he ought to know what he sells, since it is his own production, and, if he does not know it, there is on his part an incompetency which is a professional fault whereby he is rendered responsible for the damage.'
* * * * * *
`In the case of George v. [Shreveport] Cotton Oil Co., supra [114 La. 498, 38 So. 432], this Court had occasion to affirm the doctrine that a manufacturer is conclusively presumed to have known the defects of the things of his own manufacture which he has sold.' Doyle case, supra at 844 [56 So. at 908].
The Doyle case, supra, has been followed and cited with approval in a number of subsequent cases, among which is the case of Johnson v. Hunter [La.App], 88 So.2d 467 (1956) wherein the Court stated the following in affirming the holding of the Doyle case:
`The principle which governs in this case is that every one ought to know the qualities, good or bad, of the things which he fabricates in the exercise of the art, *221 craft, or business of which he makes public profession, and that lack of such knowledge is imputed to him as a fault, which makes him liable to the purchasers of his fabrications for the damage resulting from the vices or defects thereof which he did not make known to them and which they were ignorant of.'
(Johnson case, supra [88 So.2d] at 470).
It is submitted that the laws of other jurisdictions as well as the laws of the State of Louisiana place a duty upon a manufacturer to know all of the dangerous qualities of the thing which he manufactures and he is responsible to make those dangers known to parties who purchase this product and this is so even though the product itself is not inherently dangerous.
A comprehensive analysis dealing with the liability of manufacturers of products can be found in Volume 65 of Corpus Juris Secundum, which specifically discusses the duty placed on a manufacturer to know the danger of his product whether they are inherent dangers or not and the responsibility of the manufacturer to warn the public by labels or otherwise of the manner in which the product may be safely used. Particularly we would like to call the Court's attention to the following language:
`There is a duty to give notice or warning of the dangerous qualities of the article, especially where there is a representation that the product is not dangerous, and, where such notice or warning is not given, the manufacturer or seller is liable for an injury arising from a use which should have been contemplated, at least where the manufacturer or seller failing to give notice has knowledge of the dangerous qualities. If the article is dangerous to human life if improperly used, the manufacturer and distributor must apprise the public by labels or otherwise of the manner in which the article may be safely used.' (Italics ours) ([65 Corpus Juris Secundum] at page 623 [1082])
* * * * * *
"As a general rule, however, the manufacturer is under a duty to make the article carefully where its nature is such that it is reasonably certain to place life and limb in peril when negligently made, if put to the use for which it is designed and intended or to a use which can reasonably be anticipated, and there is knowledge that the article will be used, without new tests, by persons other than the purchaser; and he is liable for an injury to a third person resulting from a failure to perform this duty, if such injuries could reasonably be anticipated, although there is no contract or privity between the parties. * * * The fact that the article is not inherently dangerous if properly made is immaterial. The failure of the purchaser to make tests of the article does not absolve the manufacturer from liability to third persons.' (Italics ours) (Supra, at 629 [1094])
* * * * * *
"While the manufacturer's liability doctrine has been held to be limited in its application to finished products, it has also been held to apply to the manufacturer of an article whether it is a component part or an assembled entity."
(Italics ours) (Supra, at 632 [1103])
WE FURTHER SUBMIT TO THIS HONORABLE COURT THAT THE FACT THAT ANOTHER SIGHT GLASS (ONE FROM THE SAME BATCH CONTAINING THE ONE WHICH EXPLODED INJURING MR. PENN) EXPLODED ON THE SAME MORNING WHILE MR. ANDRUS WAS ATTEMPTING TO RUN A TEST, CONSTITUTES A VERY CLEAR INFERENCE THAT CORNING GLASS HAD NOT EXERCISED THE DEGREE OF CARE REQUIRED OF THEM IN THE MANUFACTURE OF THEIR PRODUCTS. Particularly we would like to call the Court's attention to the holding of the Supreme Court of North Carolina in the case of Davis v. Coca-Cola Bottling Co. of Asheville [228 N.C. 32], 44 S.E.2d *222 337, (1947) wherein the following language is found:
"(2) But in cases where compensation is sought for injury caused by such explosion, the rule established by this Court is that when it is made to appear that other bottles filled by the same bottler, under similar circumstances, about the same time, have exploded, there is afforded some evidence of negligence sufficient to be submitted to the jury, as it would thus form the basis for the permissible inference that the bottler had not exercised that degree of care required of him under the circumstances. Enloe v. Charlotte Coca-Cola Bottling Co., 208 N.C. 305, 180 S.E. 582; Grant v. Graham Chero-Cola Bottling Co., 176 N.C. 256, 97 S.E. 27, 4 A.L.R. 1090; Cashwell v. Fayetteville Pepsi-Cola Bottling Works, supra [174 N.C. 324, 93 S.E. 901]; Fitzgerald v. Southern R. Co., 141 N.C. 530, 54 S.E. 391, 6 L.R.A., N.S., 337. And this court has been careful, before permitting plaintiff's case to be submitted to the jury, to require that plaintiff offer evidence of other instances of bottles filled by defendant exploding under `substantially similar circumstances and reasonable proximity in time.' Ashkenasi [Ashkenazi] v. Nehi Bottling Co., 217 N.C. 552, 8 S.E.2d 818. As tending to show actionable negligence on the part of the defendant, it is competent for plaintiff to show that products produced by the defendant under substantially similar conditions and sold by it at about the same time contained the same defects, such similar instances being allowed to be offered as some evidence of defendant's negligence at time of plaintiff's injury `when accompanied by proof of substantially similar instances and reasonable proximity in time.' Tickle v. Hobgood, 216 N.C. 221, 4 S.E.2d 444, 445; McLeod v. Lexington Coca-Cola Bottling Co., 212 N.C. 671, 194 S.E. 82; Enloe v. Charlotte Coca-Cola Bottling Co., 208 N.C. 305, 180 S.E. 582; Broadway v. Grimes, 204 N.C. 623, 169 S.E. 194." (Italics ours) Supra [44 S.E.2d], at 339.
We submit that we have shown where the particular product (the sight glass which injured Mr. Penn) was produced by the defendant, Corning Glass, and was sold by its distributor at the same time that the other three glasses were acquired. We have shown conclusively that plaintiff, Mr. Penn, acquired four sight glasses on February 19, 1962, and these sight glasses were manufactured by Corning Glass with Inferno's label on them. We have shown that of these four same glasses, one exploded injuring Mr. Penn, another exploded shortly thereafter on the same day following installation by Mr. Andrus. The two remaining sight glasses, which have been introduced in evidence as "P-2" and "P-20" both contain visible bubbles or discontinuities, the effect of which has previously been discussed.
We further submit that the record is clear that Corning Glass did not test all of the sight glasses which they placed on the market (see testimony of Mr. Shand, transcript page 566) and that Inferno did not inspect them at all (transcript page 566), and we submit that this failure to test a product which they knew, or should have known, was going to be used in a gauge which was subject to high pressures constitutes negligence.
Further, we submit that Corning Glass and Inferno were negligent in failing to give any instructions to either their distributors or their consumers regarding the limitations, capabilities and use of their sight glasses in Inferno's gauges since they knew, or should have known, that these sight glasses would be used in a situation where they would be subjected to high pressures and users should have been warned of any factors which might arise due to their installation which might adversely affect the capability of the sight glasses to withstand pressure.
We submit, also, that Corning Glass and Inferno were negligent in failing to provide *223 Mr. Penn or any other purchaser with any information regarding the capacity or capability of the sight glass as to withstand any particular pressure and also to warn Mr. Penn and other consumers of any factors that might adversely affect the ability of the sight glass to hold a certain amount of pressure.
In conclusion, therefore, it is submitted that Insurance Company of North America, the insurer of Corning Glass, and Inferno are jointly liable in this case for the damages and injuries which were inflicted upon the plaintiff, Mr. John J. Penn, due to their negligence, which, among other things, consisted of their failure to properly inspect their sight glasses for defects of manufacturer; their failure to warn Mr. Penn, or any other consumer, of the capacities of their product; and their failure to warn Mr. Penn, or any other consumer, of any special care to be used in the installation or use of their product. We further submit that Inferno and Insurance Company of North America, as the insurer of Corning Glass, are liable for the injuries to Mr. Penn which resulted from the negligence and breach of warranty on the part of Corning Glass and Inferno in manufacturing (under Inferno's label) and placing a fluid level sight glass in the stream of commerce which ultimately was obtained by the plaintiff, Mr. John Penn, when said sight glass was manufactured in a dangerous and defective manner and was not safe, sound and free from latent or other vices or defects or fit and safe for the purpose for which it was to be used. We submit that under the laws of the State of Louisiana, the manufacturer is liable for his breach of warranty for placing this sight glass on the market where it was obtained by Mr. Penn when it contained bubbles or seeds which were defects which caused it to fail at a pressure at which it should have been capable of performing had these defects not been present. Likewise, under the authorities previously cited in the first portion of this brief, Inferno as a dealer or vendor should be held liable for its participation in the manufacturing process and for holding the product out as its own by placing its own label thereon. The law is clear that the manufacturer and dealer who labels a product as his own are bound to know the vices of the product and if they are aware of them, they are bound to warn the public of them. In this instance, neither was done for the evidence clearly reflects that neither Corning Glass nor Inferno properly inspected their sight glasses, or if they did inspect this batch of sight glasses, they allowed these sight glasses (one of which injured Mr. Penn) to be placed on the market when they contained bubbles or seeds which affected the capacity of these sight glasses to hold high pressure without warning their consumers, including plaintiff, that their capacity might be reduced or that the performance of the sight glass might be impaired by the presence of the bubble or seed."
C.C.Article 2545 provides:
"The seller who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, is answerable to the buyer in damages." (Emphasis ours.)
Now if we applied the common law rule in this instance which allows knowledge of the manufacturer to be imputed to a seller or dealer who is not also the manufacturer of the article when the seller or dealer has labeled the goods as his own or has in some way held the goods out to be manufactured by him, the seller then would know or should have known of the vice of the thing he sells according to the jurisprudence as cited herein. By so applying, which we do, Inferno, by the sale made under the peculiar circumstances of this case, has committed a tortious act and is liable for damages to the buyer as a co-tort-feasor and since they were properly and timely brought to court by this plaintiff, which interrupted the running of prescription herein against other co-tortfeasors, the *224 plea of prescription is held not well founded and is overruled.

ON THE MERITS AND QUANTUM
The Lower Court has favored us with written reasons for judgment wherein is found a good recitation and analysis of the facts and for that reason we are pleased to quote therefrom:
"This is an action by John J. Penn for damages for injuries suffered while engaged in testing operations on an oil and gas well known as Pan American Production Company No. 7, located on State lease No. 3258, Lake Raccourci, Lafourche Parish, Louisiana. The injuries were sustained when a high-pressure fluid level sight glass, forming part of a pressure gauge, blew out, causing serious injury to plaintiff.
The record shows that Republic Supply Company purchased one or more "S-4 reflex gauge glasses with gaskets for Inferno liquid gauge" from Joe Teuton at the request of and for the account of John J. Penn and Testers, Inc., and delivered the same to Penn immediately; and that the glasses were initially purchased from Inferno Manufacturing Corporation.
The plaintiff sued Republic, Teuton and Inferno, alleging that Inferno warranted that the said high-pressure fluid level sight glass was safe, sound and free from latent or other vices or defects and was fit and safe for the purpose for which it was being used; that Inferno was negligent in placing a dangerous, defective and improperly manufactured sight glass into the stream of commerce which ultimately resulted in injury to plaintiff.
Subsequently, the said defendants answered and by way of third party demand brought in Insurance Company of North America, the products liability insurer of Corning Glass Works, on the ground that the sight glass in question was in fact manufactured by Corning for Inferno, which made the gauge into which the sight glass was installed as a component part. Subsequently, Penn filed a supplemental petition against the insurer of Corning.
All of the defendants deny liability, pleading that there were no defects in the glass and that Penn was contributorily negligent in numerous respects.
The record shows that on June 9, 1962, the plaintiff went to the well location to supervise a testing operation which was being performed by one of the employees of Testers, Inc., of which the plaintiff was the major stockholder and president, and the business of which was testing wells. In this instance, the well was being tested to determine the rate of flow at a pressure of 900 pounds per square inch, which was to be the pressure that the well products would flow into the gas lines that would take these products to market.
The testing apparatus itself consisted of a high pressure separator unit and mounted on this testing unit was a fluid level gauge which was manufactured by Inferno Manufacturing Corporation of Shreveport, Louisiana, one of the named defendants herein. The actual gauge was introduced into evidence at the trial and is identified as Exhibit "P-3".
Both the plaintiff and his employee testified that after arriving at the well site early in the morning hours of June 9, 1962, that some period of time elapsed while the flow lines to the well were being cleaned of mud, water and other impurities prior to the testing operation. Thereafter, Mr. Andrus and Mr. Penn turned the flow of the well into the separator unit and according to the testimony of Mr. Andrus, mud or some other impurities prevented them from obtaining a fluid level in the sight glass of the fluid level gauge found on the separator unit. When this occurred Mr. Penn then removed the sight glass, cleaned it, and replaced it into the gauge and thereafter again began the testing operation. Shortly afterwards, while Mr. Penn was watching the fluid level gauge in *225 an attempt to obtain a fluid level, the sight glass, without any warning, exploded and Mr. Penn was injured.
The major issue for this Court to resolve is, of course, the cause of the explosion which resulted in the injuries of the plaintiff. The plaintiff, Mr. Penn, was unable to testify in open court due to the condition of his health and his deposition was introduced in lieu of his testimony.
The testimony is uncontradicted that the testing unit was constructed to withstand pressures of up to 1250 pounds per square inch, and the record further reflects that there were two safety devices on the testing unit which were designed to prevent overloads of pressure on the testing unit. Mr. Penn testified in his deposition that immediately prior to the explosion, he had checked the pressure gauge located on the unit and that it registered 900 pounds per square inch, which was the correct pressure for the test which they were performing. This pressure of 900 pounds per square inch was well within the rate capacity of the testing unit, and it' appears to be clear that there was no sudden surge of pressure into the testing unit which could have caused an overload of pressure, since neither of the safety devices gave way prior to or during the accident. These safety devices were checked after the explosion and found to be in working order. In addition to the safety devices being present, both Mr. Andrus and Mr. Penn testified that the flow valves into the separator unit had been opened gradually and that the pressure was slowly allowed to build up.
The record reflects that during the month of February, 1962, the plaintiff ordered four sight glasses from Republic Supply Company in Houma, Louisiana, to replace a sight glass which had cracked during the testing of a gas well near Thibodeaux. The testimony of Mr. Penn and the Republic employees conclusively establishes that Republic Supply Company acquired four sight glasses for Mr. Penn, who was one of their regular customers, through Mr. Joe Teuton of Houma, Louisiana, who did business as Teuton Specialty Company. The evidence also clearly indicates that although Mr. Penn did actually purchase these four sight glasses from Republic Supply Company (as is shown by its invoice for these sight glasses which has been filed in evidence as "P-11") that Republic Supply Company did not handle this particular specialty item and that the actual glasses which were delivered to Mr. Penn had been acquired from the defendant, Teuton, who stocked such specialty items. Mr. Penn testified that it was one of these four glasses which were acquired in February of 1962 which was installed in the fluid level gauge which subsequently exploded and injured him on June 9, 1962.
This court is convinced that the sight glass which ultimately exploded and injured Mr. Penn was manufactured by Corning Glass Works of Corning, New York. The record is abundantly clear that Republic Supply Company had acquired the sight glasses from Joe Teuton. It is likewise conclusively established that Mr. Teuton had obtained the sight glasses from Inferno Manufacturing Corporation in Shreveport, who had in turn obtained them from Corning Glass Works. Mr. A. G. Blanchard, the President of Inferno Manufacturing Corporation, testified that Inferno Manufacturing Corporation acquired these sight glasses in lots from Corning Glass Works who made them up to order in special molds and shipped them to Inferno in small boxes. Inferno placed their labels on the box, inserted gaskets for the sight glasses into the box and then shipped them to their distributors, one of whom was Joe Teuton, the owner of Teuton Specialty Company in Houma. Mr. Blanchard, the President of Inferno Manufacturing Corporation, testified that Corning Glass furnished his company with all of this particular type glass. This type of sight glass had on it certain identifying markings. On one side was "Inferno Special Alkaline" and on the other side was "Shreveport, Louisiana, U.S.A., Patent 3.25.24." *226 The remaining glasses held by the plaintiff and introduced in evidence as "P-2" and "P-20" bear these markings.
Exhibit "P-1" which is a copy of patent records on file in the United States Patent Office in Washington shows that on March 25, 1924, one George D. MacBeth of Pittsburg, Pennsylvania, obtained a patent for this particular gauge cover or sight glass and assigned this patent to the MacBeth-Evans Glass Company of Pittsburg, Pennsylvania. All Counsel stipulated that Corning Glass Company, on or about the year 1936, acquired all of the assets of MacBeth-Evans Glass Company and included in these assets were the patent rights to this particular patent. This Court is convinced from all of the evidence that the sight glass which exploded and injured Mr. Penn was manufactured by Corning Glass.
The sight glass which exploded and injured Mr. Penn was not available for testing or examination, its fragments having either been lost or disposed of following the accident. The remaining sight glasses in the possession of the plaintiff were introduced into evidence as Exhibits "P-2" and "P-20." Both of these sight glasses contained visible discontinuities or "bubbles" or seeds. These "bubbles" or seeds are admittedly the result of the manufacturing process used in making the glass and the effect of them is of primary importance to the determination of this case.
The testimony of all of the expert witnesses who were called shows that the effect of these discontinuities or "bubbles" or seeds in the glass is to double or multiply by two the stress placed on the glass at the particular location of the defect. This means simply that a sight glass such as the one which exploded injuring Mr. Penn, when subjected to 900 pounds per square inch of pressure being exerted on its inner surfaces, could have as much as 1800 pounds per square inch of stress at a particular point where there is a seed or bubble or discontinuity. This stress of 1800 pounds per square inch which could occur at the point where the seed or bubble or discontinuity is located is well above the capacity of this particular testing unit which was conclusively shown to be 1250 pounds per square inch.
Plaintiff called as expert witnesses two professors from Louisiana State University. The first expert, Dr. Edwin Chubbuck, who qualified as an expert in the field of engineering mechanics, has, in addition to a B.S. degree, a Master of Science Degree from Kansas State College, and a Ph.D. in theoretical and applied mechanics from Iowa State College. Dr. Chubbuck has an impressive record, having graduated first in his graduating class, and he has received a National Science Foundation faculty fellowship. He has considerable teaching experience at Louisiana State University and Kansas State College and has had industrial experience with General Dynamics Astronautics in California. Dr. Chubbuck has taught statics, strength of materials, experimental stress analysis, energy methods, elastic statility, theory of elasticity and advanced dynamics. It is noted that Dr. Chubbuck has had no previous connection with any of the parties in the case.
The other expert witness called by the plaintiff is Dr. Beverly James Covington, another professor who teaches engineering at Louisiana State University. Dr. Covington, in addition to his B.S. degree in civil engineering, has received both his masters degree and PhD degree from Northwestern University in Evanston, Illinois. Dr. Covington has taught at both Louisiana State University and Northwestern University, is listed in "Who's Who in American Engineering" and has taught graduate courses in mechanics and design at Louisiana State University and has taught courses in dynamics, strength of materials, and materials courses at Northwestern University.
The testimony of both of these expert witnesses for the plaintiff is clear and unequivocable that the effect of a seed or *227 bubble or discontinuity in the glass is to double the stress resulting from pressure applied at that particular point.
It should be noted that the particular sight glass which exploded injuring Mr. Penn was installed in February, 1962. The record establishes that numerous tests were run with that test unit between the installation in February and the date on which the accident occurred. During this time the gauge and sight glass functioned without any difficulty and gave no warning of any problem, but Dr. Chubbuck explains the cause of the explosion on June 9, 1962, as being associated with certain other factors which would affect the pressures exerted on the sight glass. Dr. Chubbuck's testimony is that a change in the mounting stresses, acting together with the residual stresses placed in the glass at the time of manufacture plus the pressure stresses being placed upon the glass, could bring the material in the vicinity of one of the seeds or discontinuities to a critical state or level at which the glass would fracture. Dr. Chubbuck's explanation as to why the sight glass functioned properly from the time of its original installation in February of 1962 until June 9, 1962, when it failed a short period of time after it was taken out and cleaned, is the most plausible and the most reasonable explanation as to the cause of the explosion. Dr. Chubbuck indicates in his testimony that with a sight glass wherein the imperfections were present that a remounting of the glass could cause a slight shifting of the stresses exerted on the glass and if this should happen to concentrate stresses at the location of a seed or discontinuity then it could cause a failure of the glass at the same pressure which it had previously withstood. Dr. Chubbuck further indicates in his testimony that the changing of the seating of the sight glass could be well within the acceptable tolerance of workmanship for the installation of the sight glass and yet just the minor variations in these mounting stresses could be the unhappy circumstance which, when combined with the pressure applied to the gauge, and the positions of the discontinuities or bubbles or seeds could cause the failure.
At this point it should be noted that the plaintiff, Mr. John Penn, was a highly qualified, experienced and capable well tester. Mr. R. W. Wiggins, the production superintendent for Pan American Production Company, a man with thirty years of oil field experience, testified that he had known Mr. Penn for a period of some twenty years and that he considered Mr. Penn to be a highly qualified and skilled well tester. The production supervisor for Ocean Drilling and Exploration Company, Mr. James C. Evans, was likewise of the opinion that Mr. Penn was a highly qualified and skillful well tester. Additionally, Mr. Penn's own personal record shows many years of experience in the oil fields handling such equipment and it discloses that Mr. Penn had 3½ years of petroleum engineering training at Rice Institute. This Court feels that certainly if anyone was qualified to change a sight glass or remount one in the field that Mr. Penn had all the necessary qualifications and experience necessary to capably and expertly perform the job. The record further reflects from the testimony of other witnesses who were oil field supervisors that changing, cleaning, or replacing sight glasses in the field is commonly performed.
The issue was raised by defendants that Mr. Penn, in remounting the sight glass after it had been taken out and cleaned on the morning of June 9, 1962, did not use a torque wrench to tighten the bolts on the back of the gauge assembly. Thus, it is argued that Mr. Penn was negligent in not applying the correct amount of torque to each bolt which could conceivably cause unequal stresses to be applied to the sight glass and cause its ultimate failure. This Court cannot help but note that Mr. Charles Cain, who had over twenty-five years of experience in the oil fields as a production and drilling foreman for Texaco, Inc., and Mr. James Evans, the production supervisor for Ocean Drilling and Exploration *228 Company, who has also had considerable experience, both testified that it is the custom in the oil field to use a regular crescent wrench, such as the one that Mr. Penn used, to install sight glasses of this type in the field. It is apparent that Mr. Penn was following an established procedure or custom of his trade by using a crescent wrench in the remounting operation and this Court does not consider that his failure to use a torque wrench indicates negligence on his part. Mr. Penn's employee, Morrell Andrus, further testified that when Penn remounted the sight glass on June 9, 1962, that he tightened the bolts on the back of the gauge assembly in a uniform manner and followed the normal procedure for installation, that is, tightening the six bolts in alternate order so that the glass would not be tightened excessively at any one place.
This Court also notes that the record establishes that shortly after the sight glass exploded injuring Mr. Penn that his employee, Morrell Andrus, replaced it with another glass and that this second glass, after being used for a short period of time, also exploded.
The fact that this second sight glass, which was another of the four which had been purchased in February of 1962 exploded, lends further inference that Corning Glass had not exercised the degree of care required of them in the manufacture of their product.
Only one witness testified on behalf of the defendant, Corning Glass Works. This witness, Mr. Errol Shand, was an employee of Corning Glass Works for some twenty-two years and retired in 1958 due to age limitations. Mr. Shand has doubtless had considerable practical experience in matters involving the manufacture and the problems of glass although the extent of his formal education was a B.S. Degree in electrical engineering. This Court notes that Mr. Shand has worked as a consultant for Corning Glass and other clients since his retirement, and that Mr. Shand admits that through the years Corning Glass has been one of his better clients. Although he gave considerable testimony concerning the process followed in the manufacturing of these sight glasses by Corning Glass Works, this Court notes that Mr. Shand's experience with the manufacture of these sight glasses occurred approximately twenty years ago.
The defendant's expert witness, Mr. Shand, attempted to explain the cause of the explosion as a result of a defect in the gauge in which the sight glass was mounted. Mr. Shand, noting there was a disparity in the gaps between two certain iron flanges on the fluid level gauge assembly, was of the opinion that these disparities in the gaps indicated that the gauge was "sprung." Mr. Shand therefore concluded that the explosion of the sight glass was caused by the "sprung" gauge causing an unequal distribution of pressure from the flanges of the gauge which hold the sight glass upon the edges of the sight glass which, in turn, caused an increase of stress on the surface of the sight glass and its resulting failure. This theory that the explosion was caused by the "sprung" gauge was completely disproved and it was shown conclusively in open court that the so called "disparity" in the gap was not a distortion in the gauge at all but was rather a manufactured characteristic of the gauge. There is no evidence at all of any defect in the gauge.
Mr. Shand's testimony in certain respects does coincide with that of Dr. Chubbuck, the plaintiff's main expert witness. With regard to the effect of the seeds or "bubles" or discontinuities in the glass, Mr. Shand testified as follows:
Q. Now, you say that there are specifications that if a seed or bubble is larger than a certain size they are rejected?
A. That is my recollection.
Q. You heard Dr. Chubbuck testify earlier today that not necessarily the size of the bubblein fact it was in *229 reversethat the smaller the bubble it put more stress on it than a larger bubble. Did you hear his testimony along that line?
A. I don't agree with him.
Q. You are in disagreement with him.
A. Right. The stress produced in a spherical cavity is independent of the size of the cavity.
Q. But it is I believe two times more in a sphere than it would be if the imperfection were not there at all.
A. That is right.
Q. So if this glass gauge blew at nine hundred pounds at that particular point where this seed occurred, the stress would be eighteen hundred pounds.
A. No, that is not quite correct because I would prefer to put it this way. The stress at that point would be the same as it would have been in a glass without that void at eighteen hundred pounds.
Q. Again I'm a layman, but let me see if I can get it in layman's language. There was more pressure, twice as much pressure, put at the point of that seed as there was at a point on another portion of the glass that had no seed.
A. You change that word `pressure' to `stress' and I will agree with you.' (Transcript 2, pages 91, 92)
Thus it appears clear that the defendant's expert agrees that the stress at a particular point where a seed or "bubble" was located in the sight glass would be two times greater than it would be on other portions of the glass which had no seed or "bubble".
Mr. Shand, the defendant's expert witness, further recognized that the failure of the glass which had no seed or "bubble". glass was reassembled in its mounting in a slightly different position. This is shown by his following testimony.
"* * * Then if you put the gauge back again in a little different position, as Professor Chubbuck said this morning, that irregularity in the gasket transfers stresses and pressures to the glass that normally should not be there. This may have come because of some injury to the gauge body and maybe with a long time flaw of that gasket as it was set up originally you get a certain amount of flow there which could adjust as long as it was able tono pressure was put on it for a long period. You would get a small amount of flow of the gasket which might compensate to some degree. Then when you put the gauge back a different way and maybe the gaskets are rotated differently you get a different condition of flatness. That can produce stresses in the glass that might break it. In this case it was found I believe when Mr. Penn put theI am not sure about thiswhether the gauge leaked when he first put it back or not.' (Transcript 2, pages 69, 70)
Mr. Shand further testified that there are variations from glass to glass in the amount of pressure that these sight glasses can take before failing, he admits that Corning did not test every glass that they made and he testified that the only material which he had in his possession giving some information regarding the capacity or capabilities or limitations of these sight glasses was his book which contained a table giving the recommended working pressures for this type of gauge glass. The record clearly indicates that the distributors and/or users of these sight glasses were not furnished with a copy of this material or with any instructions or warnings or literature which in any manner apprised the user of the glass gauge of any limitations which might affect is [its] performance or which gave any specific instructions as to any special care that should be used in their use.
*230 Obviously, the presence of "bubbles" or seeds has an adverse or detrimental effect upon the ability of a sight glass to withstand pressure. These "bubbles" or seeds which are acquired in the product during manufacture have been shown to cause the failure of the product at a normally safe pressure when their presence is combined with certain other factors. This Court considers the presence of these "bubbles" or seeds to be a defect of manufacture. This Court entertains no doubt at all but, as is shown by a preponderance of the evidence, that the sight glass which exploded on June 9, 1962, injuring Mr. Penn contained the same imperfections found in the other sight glasses which were manufactured by Corning Glass and which were purchased by Mr. Penn and these defects were the proximate cause of the explosion.
Under Louisiana law a manufacturer is presumed to know the vices of his product and that if damage results from the sale of this product without revealing the defects to the purchaser, that the manufacturer is held liable for damages. (Doyle v. Fuerst et al, 129 La. 838, 56 So. 906, Johnson v. Hunter [La.App.], 88 So.2d 467 (1956).
Other jurisdictions recognize the duty of a manufacturer to know all of the dangerous qualities of the thing he manufactures and a comprehensive analysis dealing with products liability can be found in Volume 65 of Corpus Juris Secundum, wherein the duty placed upon a manufacturer to know the danger of his product and to warn the public by labels or otherwise of the manner in which the product may be safely used is specifically discussed:
"There is a duty to give notice or warning of the dangerous qualities of the article, especially where there is a representation that the product is not dangerous, and, where such notice or warning is not given, the manufacturer or seller is liable for an injury arising from a use which should have been contemplated, at least where the manufacturer or seller failing to give notice has knowledge of the dangerous qualities. If the article is dangerous to human life if improperly used, the manufacturer and distributor must apprise the public by labels or otherwise of the manner in which the article may be safely used.' ([65] Corpus Juris Secundum at page 623 [1082])
`As a general rule, however, the manufacturer is under a duty to make the article carefully where its nature is such that it is reasonably certain to place life and limb in peril when negligently made, if put to the use for which it is designed and intended or to a use which can reasonably be anticipated, and there is knowledge that the article will be used, without new tests, by persons other than the purchaser; and he is liable for an injury to a third person resulting from a failure to perform this duty, if such injuries could reasonably be anticipated, although there is no contract or privity between the parties. The fact that the article is not inherently dangerous if properly made is immaterial. The failure of the purchaser to make tests of the article does not absolve the manufacturer from liability to third persons.' (Supra, at 629 [1094])
`While the manufacturer's liability doctrine has been held to be limited in its application to finished products, it has also been held to apply to the manufacturer of an article whether it is a component part or an assembled entity.' (Supra, at 632 [1103])
The plaintiff has shown conclusively that the sight glass which caused his injury was produced or manufactured by Corning Glass. This sight glass, along with three others, were acquired by the plaintiff, Mr. Penn, from Republic Supply Company through Joe Teuton at the same time the other three sight glasses were acquired. Of these four sight glasses, one exploded injuring Mr. Penn, a second exploded on the same day shortly after Mr. Penn's accident *231 and the remaining sight glasses, which are filed in the record in evidence, both contain visible bubbles or discontinuities which, according to the testimony of all of the expert witnesses, affect the ability of these sight glasses to withhold pressure. Corning Glass admittedly did not test each sight glass and it is the opinion of this Court that this failure to test a product which they knew or should have known was going to be used in a gauge which was subject to high pressures, constitutes negligence. It is their duty to know that an imperfection in their glass could cause an increase in stress at a particular point on a glass being used which could cause the failure of that glass at an otherwise safe pressure. Corning Glass also failed to give any instructions, either to their distributors or to their consumers nor does the record reflect that they provided any literature regarding the limitations, capabilities and uses of their sight glasses to either their distributors or consumers. Corning Glass knew, or should have known, that these sight glasses would be used in gauges where they would be subjected to high pressures and stresses and users should have been warned of any factors which might adversely affect the capability of the product to withstand pressure.
It is further noted that Corning Glass failed to provide the consumers with any information regarding the capacity or capability of the sight glass to withstand any particular amount of pressure. The consumer or user of the sight glass is apparently left to his fate since he has no way of knowing what pressure he can expect the glass gauge to withstand and according to the testimony of the defendant's own expert, Mr. Shand, there are variations from glass to glass that affect the maximum amount of pressure that they can hold. The consumer who is using the product properly and is injured as a result of a defect in this product should not bear the loss occasioned by the failure of the product, but rather the law requires that the manufacturer should be held responsible for the defective product causing the injuries to the consumer.
As to the plea of contributory negligence found in the answer filed on behalf of Insurance Company of North America, the insurer of Corning Glass, it must be pointed out that there is no proof in the record that when Penn arrived on the job on June 9, 1962, that he was in either a bad physical or mental condition. While the record does reflect that Mr. Penn was wearing a cervical collar as a result of a previous automobile accident, the record does clearly reflect that his doctor had allowed him to return to work and there is no showing of any mental incapacity.
There is likewise no evidence in the record to show that Mr. Penn placed himself in a position of danger since it is obviously clear that Mr. Penn had no reason to expect that there was any danger of a sight glass exploding. Neither Mr. Penn nor any of the other experts familiar with the oil industry who testified at the trial, with their many years of experience, had ever seen a sight glass explode, and with the additional fact that this particular sight glass had been used in numerous tests since its original installation in February of 1962, it is apparent that Mr. Penn had no reason to anticipate that he might be in danger from the glass exploding.
There are no indications of any negligence on the part of Mr. Penn in assembling or remounting the sight glass. Mr. Andrus, the employee who was on the job on the morning of the accident, testified that Mr. Penn reassembled the sight glass gauge in a careful and proper manner after having cleaned off the sight glass, and the record as a whole abundantly reflects that Mr. Penn was an experienced and capable well tester operator who was an expert in handling this particular type of equipment. Accordingly, this Court cannot presume that Mr. Penn improperly mounted the sight glass which exploded on June 9, 1962, causing his injuries. The defendant must carry the burden of proof in this plea of contributory *232 negligence, and this it has not donein fact, the record is devoid of any evidence showing improper installation.
There is also no evidence that Mr. Penn in any way damaged the sight glass between the date of its acquisition and the date of its explosion on June 9, 1962. The record clearly reflects that on the morning of June 9th prior to the explosion, Mr. Penn had removed, cleaned and inspected it before returning it to its gauge assembly, and if any inference should be drawn from these actions, it should be that he would have changed the glass if there was any damage to it, as there were spare sight glasses available at the scene which could have easily been substituted.
As a result of the explosion of the sight glass which took place on June 9, 1962, Mr. Penn sustained serious and disabling injuries. At the time of the trial Mr. Penn was unable to testify and was confined to Southern Baptist Hospital in New Orleans, having recently undergone surgery to relieve some of the pain which he was suffering. Both his attending physicians, Dr. Saul Landry, Jr. of Houma, Louisiana, and Dr. Richard M. Paddison, a neurologist from New Orleans, Louisiana, who has attended and treated Mr. Penn on numerous occasions, testified that Mr. Penn is totally and permanently disabled and that his prognosis for recovery is extremely poor.
Since February of 1963, Mr. Penn has been confined to the bed and has been unable to get up and move about except with the greatest of exertion and then only with assistance from his wife and son.
The explosion itself caused lacerations about Mr. Penn's head, left arm and neck. These were treated and he was released from the hospital, but he then sustained a severe reaction to penicillin which had been administered to him and it was necessary that he be returned to the hospital for an additional stay of six days.
Mr. Penn suffered a heart attack prior to the accident in June of 1962 and he had problems associated with hardening of the arteries prior to the explosion. In spite of this, he was able to function as a normal human beingthat is, he was able to work, drive his automobile, socialize with his friends, and lead a normal family life. All the medical evidence indicates that the explosion severely aggravated Mr. Penn's circulatory problems and that his general physical condition greatly worsened following his injury in the explosion. After undergoing tests in Southern Baptist Hospital in New Orleans, he began suffering convulsions. He has suffered severe headaches and severe pains in the legs and feet, a loss of equilibrium and a visual field loss in one eye. Mr. Penn has suffered severely from headaches which were so bad that he had to be given injections of medications at various times of day and night to relieve the pain, and since February of 1963 he has been unable to do any work or lead any normal activities. Mr. Penn has been recognized as being completely and totally disabled by his Workmen's Compensation Insurer and the Social Security Administration. All the medical evidence indicates that Mr. Penn will never be able to return to work and further indicates that there is no hope for any improvement in his physical condition. He will continue to suffer severe pain for the rest of his life and will remain totally disabled in bed for the remainder of his days.
Mr. Penn's medical expenses total $10,383.37. These medical expenses are substantiated by the statement of Travelers Insurance Company, his Workman's Compensation Insurer, in Exhibit "P-21" showing that Travelers Insurance Company paid a total in medical expenses of $8,655.87. At the time of the trial, Mr. Penn had other medical bills including a bill from Southern Baptist Hospital which totalled $1,360.00, which was introduced in evidence as "P-23", a bill for Anesthesia Associates in New Orleans, identified as "P-24" for $85.00, another bill from Anesthesia Associates in New Orleans, identified as "P-25" for $35.00, a bill for nursing expenses identified as "P-26" for $67.50, a bill for nursing expenses *233 identified as "P-27" totalling $180.00. All of these items totalled together equal medical expenses of $10,383.37.
It has also been established that Mr. Penn will incur future medical expenses and filed in the record as Exhibit "P-22" is a statement from Dr. Saul Landry, Jr. giving an estimate of Mr. Penn's future medical expenses as follows:

 Daily medication per month $ 53.80
 Pain relievers per month 10.00
 Doctors calls two per month 14.00
 Orderly to bathe per month 24.00
 Hospitalized about 2-3 times a
 year about $75.00 to $100.00
 each hospitalization

Dr. Landry's evidence indicates that Mr. Penn can expect to have future medical expenses of at least $101.80 per month for medication, pain relievers, doctors' calls and an orderly to bathe him or a yearly total of $1,221.60. Taking an average of the estimated hospitalizations which are expected, this amounts to approximately $225.00 per year or a total yearly expenditure of $1,446.60 for the remainder of his life. Mr. Penn was born on August 22, 1909, and at the trial of this case was 56 years old. According to the Louisiana Life Expectancy Tables found in LRS 47:2405, he has a life expectancy of 16 years, so multiplying $1,446.60 by 16 years gives a total of $23,145.60. Allowing a discount of 5% for the 16 years means that Mr. Penn is entitled to a judgment for future medical expenses in the sum of $10,603.23.
Mr. Penn's loss of earnings are substantiated by his income tax returns which were filed in evidence. Exhibit "P-6" which shows his earnings for the taxable year 1961, his last full working year prior to his injury, shows Mr. Penn had a gross income from his work of $18,578.79. Mr. Penn's 1962 income tax return, which was filed into evidence as Exhibit "P-7" shows income in 1962 of $9,859.91.
Thus, according to Mr. Penn's own tax records he sustained a loss of earning for the year 1962 totalling $8,718.88. In 1963, Mr. Penn's income tax return shows earnings of $3,400.00 which means that for the taxable year 1963 Mr. Penn sustained a loss of earnings in the sum of $15,178.79. For both 1964 and 1965 it has been established that Mr. Penn had no earnings at all and was existing solely on his workman's compensation and social security benefits. Thus, Mr. Penn has provable loss of earnings for the years 1964 and 1965 totalling $37,157.58, or altogether a total loss of income to date from his injuries on June 9, 1962, in the amount of $61,055.25.
With regard to Mr. Penn's future loss of earnings, it is recognized by our Supreme Court that the assessment for damages for loss of future earnings is not an exercise in pure mathematics based upon some inflexible formula. In the case of Pennington v. Justiss-Mears Oil Company [242 La. 1], 134 So.2d 53, the Supreme Court of our state indicates that the assessment for loss of future earnings requires the application of solid judicial discretion to the circumstances disclosed by the record. See also Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891; McFarland v. Illinois Central Railroad Company [241 La. 15], 127 So.2d 183 [87 A.L.R.2d 246]. The evidence in this case shows that Mr. Penn was a successful business man who has a life expectancy of 16 years. His cash income has reached more than $18,500.00 per year. Using the mathematical formula of multiplying the cash earnings by the life expectancy, then discounted at 5% per annum, Mr. Penn would be entitled to an award of $136,200.00 for loss of future earnings. In view of the holding of the Supreme Court of the State that the Courts of this state can no longer use a mathematical formula for calculating the loss of future earnings, this Court can only award what it considers to be a fair and reasonable amount for loss of future earnings based on the circumstances as shown. Gaspard v. LeMaire [245 La. 239], 158 So.2d 149; Ballard v. National Indemnity Co. [246 La. 963], 169 So.2d 64. Under the circumstances *234 of this case, an award for $120,000.00 is in this Court's considered opinion proper to compensate this individual who has been the sole support of his wife and child and who will be unable to provide for their livelihood in the future.
In arriving at a determination of the loss of future income, this Court has also considered the case of James v. State [Through Bd. of Adm'rs., etc.], of Louisiana [La.App.], 154 So.2d 497 (1963) wherein a judgment allowing $77,439.44 for loss of future earnings was affirmed in the case of a 44 year old man who sustained injuries which left him a paraplegic. The decision in the James case reveals that James was earning $95.00 per week, considerably less than Mr. Penn, whose earnings of $18,500.00 per year are the equivalent of $355.80 per week.
With regard to an award for pain and suffering, this Court must note that Mr. Penn will be confined to his bed for the remainder of his life. He has suffered convulsions and severe pain and has been relegated to a life in which he can expect nothing more than pain and suffering for the remainder of his days. Mr. Penn will be faced with future hospitalization and his prognosis by all of his doctors is that he will continue to suffer and about all they can do for him is to take steps to try to relieve his suffering during the remainder of his life.
Under the circumstances, this Court considers an award of $120,000.00 is in order for his pain and suffering, anxieties, loss of social life and for his total dependency on others for his every movement.
Accordingly, judgment will be rendered in favor of the plaintiff and against defendant, Insurance Company of North America, in the full sum of $322,041.85, together with legal interest thereon from the date of judicial demand, June 7, 1963, and for all costs of these proceedings.
The expert witness fee of Dr. Richard M. Paddison is hereby fixed at the sum of $200.00 and the expert witness fee of Dr. Saul Landry, Jr. is hereby fixed at $100.00 and said fees are hereby ordered taxed as costs.
In so far as plaintiff is concerned, Inferno held itself out to be a manufacturer, as was clearly indicated by its name on the component parts of the gauge, one of which was the sight glass which failed because of defects in manufacturing. Hence, plaintiff is entitled to look to Inferno as a warrantor of the product which it held itself out to have manufactured. However, it was clearly established that the sight glass was manufactured by Corning Glass Works for Inferno; and it is our view that Inferno is entitled to call upon Corning as warrantor.
Thus, there should be judgment for plaintiff against Inferno and Insurance Company of North America, the insurer of and Corning in solido, and in favor of Inferno against Insurance Company of North America."
We have studied this record and find the facts as found by the Lower Court to be correct. Due to the nature of the injuries received by the plaintiff herein, we feel that the awards given by the Lower Court were adequate and not excessive. See Gaspard and Ballard, supra.
Since it is our opinion that Inferno Manufacturing Corporation was a co-tortfeasor with Corning Glass Works, the assured of Insurance Company of North America, they should be held liable jointly and in solido, and for that reason the judgment of the Lower Court should be and is hereby amended so as to dismiss the third party claim of Inferno and against Insurance Company of North America and, as amended, the judgment is affirmed.
Judgment amended and affirmed.
REID, Judge (dissenting):
The first and most important point to be discussed relative to the Trial Court's judgment *235 against Insurance Company of North America is that of prescription, since the record discloses that Insurance Company of North America was not made a party to the suit until after one year had passed.
The majority chose to adopt the plaintiff's brief as to the question of prescription, with which I respectfully dissent.
Plaintiff-appellee contends that prescription had not run based upon three possible theories. The first is that Inferno and Corning, Insurance Company of North America's insured, were joint tortfeasors and that prescription does not run against a tortfeasor who is liable jointly and in solido; the second, that a fraud has been perpetrated upon the plaintiff and that the prescription period for fraud is ten (10) years; and third, that plaintiff could not have been apprised of the facts that Corning was the manufacturer, and that, therefore, prescription did not rerun.
As to question of fraud, plaintiff-appellee relies on Article 2547 of Louisiana Civil Code which states as follows:
"A declaration made by the seller, that the thing sold possesses some quality which he knows it does not possess, comes within the definition of fraud, and ought to be judged according to the rules laid down on the subject, under the title of: Of Conventional Obligations.

"It may, according to circumstances, give rise to the redhibition, or to a reduction of the price, and to damages in favor of the buyer."
Clearly, the Code article does not apply to the case at bar since the evidence reveals no "declaration" within the meaning of Article 2547, and no "fraud" has been proven. Therefore, the ten (10) year prescription provided in cases of fraud does not apply.
The plaintiff next contends that prescription does not run against one without knowledge of facts which would entitle him to bring a suit against the proper defendant. In support of this, the plaintiff cites Waltes [Walter] v. Caffell [Caffall], [192 La. 447], 188 So. 137, as clearly setting forth the above rule. However, a brief look at this case reveals that it can in no way be used as authority for the proposition that lack of certain facts as to the proper defendant will prevent the tolling of prescription as to the proper defendant. In Waltes [Walter] v. Caffall, the plaintiff was not aware of certain facts which would have apprised him of his cause of action. In no way could this be interpreted to include a situation wherein the plaintiff fails to sue the correct party. The best view is that taken in Martin v. Mud Supply Co. [239 La. 616], 119 So.2d., 484. In the Mud case, the original petition was filed within a year of the accident, but the defendants' insurer was not made a party after the year had run when the plaintiff amended the petition so as to name the insurer. The Supreme Court found that the insured and its insurer were not bound in solido, and that, therefore, prescription was not interrupted as to the insurer, notwithstanding the insurer's actual knowledge of the suit as long as there was no fraud or concealment by the insurer. In the present case, there being no evidence of fraud or concealment proven, there can be no interruption of prescription unless it is found that Inferno and Corning were joint-tortfeasors.
This brings us to the question of whether or not Inferno and Corning were joint-tortfeasors. In attempting to establish such a relationship the plaintiff-appellee apparently relies on two possible theories, the first being that Corning and Inferno shared the manufacturing process, and the other if the common law is applied, they will be "co-tortfeasors", a unique term indeed.
Let's consider further the assertion that they shared in the manufacturing process. It is too well settled to require authority that a plaintiff must prove his claim to a fair preponderance before he is entitled to recovery. Further, it has been held that the burden of proof is on the party who asserts that the defendants are joint tort-feasors. Danks v. Maher [La.App.], 177 So.2d., 412.
*236 From this, certainly it would seem that the burden of proving that Inferno and Corning were joint tort-feasors was on the plaintiff. Plaintiff's brief, however, unintentionally admits that this burden has not been borne, stating:
"It just could be that the `bubbles' resulted from faulty or defective molds which are apparently owned by Inferno. For that reason alone, Inferno should be considered as party to the manufacturing process and held liable in solido as a manufacturer." (Emphasis supplied).
If this is not surmise and conjecture, then what is? Under Civil Code Article 2324, as interpreted, one party must actively cause, assist, or encourage another in the commission of a tort before they are considered joint tortfeasors. Cox v. Shreveport Packing Co., 213 La. 53, 34 So.2d., 373, 375, (1948). Knott v. Litton [La.App.], 81 So.2d., 124.
The next basis for plaintiff's contention that Inferno and Corning are joint tort-feasors is that if the common law position is adopted, then they would be "co-tortfeasors". Without going into the question of just what a "co-tort-feasor" is, and the significance thereof, it must be held that the common law does not apply in Louisiana, that Louisiana has its own well reasoned jurisprudence in this area which will appear more fully later, and that there is no reason to adopt the common law position at this time.
Without being too concerned with an unnecessary discussion as to Inferno's liability at this point, it must be found that the record is totally lacking as to any evidence showing that Inferno and Corning were joint tortfeasors. The contention of Insurance Company of North America, defendant-appellant, that the Trial Judge, by rendering judgment for indemnity in favor of Inferno and against Insurance Company of North America, destroys his finding that Inferno and Corning were joint tortfeasors bears much weight. The record discloses nothing that would indicate that Inferno and Corning were in any manner acting in concert, and cannot be considered joint tortfeasors. For this reason, the Court has no choice but to find that prescription of one year as provided under Civil Code Article 3536 had run at the time that Corning was made a party to the suit.
This brings us to the question of Inferno's independent liability. The plaintiff herein apparently realizes fully that the Louisiana law in this area is contra to his position. This is evidenced by the statement made by the plaintiff on page 10 of his brief, to-wit:
"This case, we submit, exhibits the most logical reason why the common law rules which hold a dealer or vendor liable for mislabeling of a product should be adopted in Louisiana."
However desirable this may or may not be, it is not the law. We believe, as do the defendants herein, that the Louisiana law in the area was clearly enunciated in the case of Coignard v. F. W. Woolworth & Co., 175 So. 123 (Orl.App.1937). In that case, speaking through Judge Westerfield, stated:
"But whatever may be the rule elsewhere, under express codal provisions in Louisiana, the vendor, who is not shown to be acquainted with the vices of the thing sold, is bound only to restore the price and to reimburse the expense occasioned by the sale. The following articles are pertinent and conclusive of the issue:
"Article 2475: `The seller is bound to two principal obligations, that of delivering and that of warranting the thing which he sells.'
"Article 2476: `The warranty respecting the seller has two objects; the first is the buyer's peaceable possession of the thing sold, and the second is the hidden defects of the thing sold or its redhibitory vices.'
"Article 2520: `Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it *237 either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.'
"Article 2521: `Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibitory vices.'
"Article 2529: `A declaration made in good faith by the seller, that the thing sold has some quality which it is found not to have, gives rise to a redhibition, if this quality was the principal motive for making the purchase.'
"Article 2530: `The buyer who institutes the redhibitory action, must prove that the vice existed before the sale was made to him. If the vice has made its appearance within three days immediately following the sale, it is presumed to have existed before the sale.'
"Article 2531: `The seller who knew not the vices of the thing, is only bound to restore the price, and to reimburse the expenses occasioned by the sale, as well as those incurred for the preservation of the thing, unless the fruits, which the purchaser has drawn from it, be sufficient to satisfy those expenses.'
"Article 2545: `The seller who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, is answerable to the buyer in damages.'
"Unless the vendor knew of the vice of the thing sold and failed to declare it, he cannot be held answerable in damages. No allegation to this effect is found in the petition, nor is there any charge of negligence."
In support of this position the attorneys for Inferno correctly cite the cases of Hurley v. J. C. Penny Company [La.App.], 140 So.2d., 445, and Boyd v. J. C. Penny Company [La.App.], 195 So. 87.
In the Hurley case the plaintiff contended that J. C. Penny Company was liable for the defective manufacture of a lawn mower since it published a book of instructions which was a part of the package that was sold in the transaction. The defendant, J. C. Penny Company, upon showing that it had not manufactured the lawn mower and had no knowledge of any defect in the manufacture, was dismissed.
In the Boyd case the plaintiff purchased a dress from J. C. Penny Company which was identified with the Penny trademark. The dress was found to have contained some sort of toxic material and this had caused the onset of a serious rash on plaintiff's skin.
In affirming a judgment dismissing the plaintiff's suit, the court followed the rule announced in Coignard v. [F. W.] Woolworth [& Co.], supra, and stated that there is no law or rule of evidence in Louisiana which would impute to the seller of the goods knowledge of latent vices and defects particularly where, as in this case, the seller did not manufacture the article in question.
Without proof of knowledge of the defects on the part of Inferno, Inferno can in no way be held liable for any damages sustained as a result. No such knowledge can be imputed. This being true, there is no need to enter into a discussion of the case on the merits.
For these reasons, I respectfully dissent herein.