PROVOSTY, J.
[1] The defendant keeps a confectionary where refreshments are served to the public to be consumed on the premises. Plaintiff alleges that he was ptomaine poisoned from having eaten cakes and chocolate with whipped cream at defendant’s establishment, and demands $150 damages for the sufferings caused by the illness.
The defense is that the said food was wholesome, and plaintiff was not poisoned; but that, if he was, defendant is not responsible, because not guilty of any negligence; and that, at all events, the measure of the damages is simply the restitution of the price.
We agree with the trial court and with the Court of Appeal in finding that plaintiff was poisoned as alleged. He partook of the said refreshments at about 11 o’clock at night, and, on leaving defendant’s establishment, went home and to bed, after having escorted to her home a lady who accompanied him; and at about 5 o’clock the next morning the symptoms of the poisoning manifested themselves. He had taken no other food during that day or the day before except such as all his family had shared with him without being made sick. The lady who accompanied him at defendant’s establishment on the occasion in question ate ice cream and cakes, and was, like him, taken sick during the night from ptomaine poisoning.
In proof of absence of negligence on its part, defendant produced its purchasing-agent and its head baker and the traders from whom it buys its flour, sugar, eggs, and butter. The clerk testified that he purchased none but the best flour, sugar, eggs, milk, and butter, and that great care was exercised in keeping everything about defendant’s establishment clean. The baker testified that he took great care to keep things clean, and that they were kept so. On cross-examination, he said that an investigation had been made of defendant’s establishment by the health authorities in the early part of 1909, and that some two months before the time of his testifying the boss had told him of a young man having been made sick. Comparison of dates shows that this young man was not plaintiff, and that the board of health’s investigation was some nine months before the poisoning of plaintiff. The traders called as witnesses testified that defendant bought none but the best flour, sugar, eggs, and butter.
This evidence falls short of showing even ordinary care, since it contains not a word touching the time when the particular eggs, milk, cream, and butter served to plaintiff and his lady companion had been bought, or when the ice cream, cakes, and chocolate had been made; so that, for what appears, the. materials out of which these refreshments had been made may have had ample time to deteriorate on defendant’s hands, and the refreshments themselves may have been of long standing — kept on hand indefinitely until they should be disposed of in due course of business.
The principle which governs in this case is that every one ought to know the qualities, good or bad, of the things which he fabricates in the exercise of the art, craft, or business of which he makes public profession, and that lack of such knowledge is *841 imputed to him as a fault, which makes him liable to the purchasers of his fabrications for the damage resulting from the vices or defects thereof which he did not make known to them and which they were ignorant of.
This principle obtains both in the civil and the common law, as appears from the excerpts hereinafter given.
It is needless to consider what qualifications or restrictions this principle may suffer in particular cases. Suffice it to say that it has full play in the present case, where chocolate and cakes were sold at a public eating place to be consumed on the premises. It is easily possible for the keeper of such a place to know in all cases whether the eggs, milk, and butter he sells, or the articles of food he has made out of them, are fresh and fit for human consumption. He is therefore at fault if these articles prove to be vitiated and deleterious.
'[2] The measure of damages in a case of this kind, where there was no actual knowledge of the vices of the things sold, but only an imputed knowledge, is not simply reimbursement of the price, as contended by defendant, but liability on the part of the seller for all the damages that were foreseen, or could easily have been foreseen, as - likely to result from the putting of the thing sold to the use for which it was sold. This fully appears from the excerpts hereinafter given.
It is common knowledge, to which the keeper of a public eating place must be held, that food in which the process of decomposition has begun is liable to make the person who eats it ill. Indeed, we do not think there can be any serious difference of opinion on the point that an eating establishment which sells unwholesome food to be consumed by its customers must be held to have contemplated the probable effects of such tainted food upon the customer.
[3] The sole question must then be as to what amount of damages was caused to plaintiff by his illness. He says he was attacked with intense pains in the stomach, with vomiting and great looseness of the bowels; that he tried to get a physician at once, but did not succeed in getting one for two hours; that until the physician came he was badly frightened, thinking himself in danger of death; that he remained in bed that day; that he continued to have pains in his stomach for about a month; that this illness brought on an attack of jaundice which lasted about six weeks.
The physician testified that he found plaintiff prostrated and in a stupor, with small, weak pulse, and that plaintiff was vomiting, and suffering from cramps in the bowels, which seemed to be intense.
The Court of Appeal allowed $100 damages.
Excerpts Bearing Upon Imputed Fault.
In the case of McCubbin v. Hastings, 27 La. Ann. 713, where a druggist’s clerk had by mistake sold spirits of camphor instead of camphor water for the purpose of an enema, and the plea of absence of negligence was made, this court said:
“It may, however, be assumed that he was competent. The defendant’s liability would be none the less certain. The defendant is himself represented as being a most competent druggist. If he had made the mistake, would his proficiency in his calling shield him? Or would it not rather aggravate the fault? Incompetency and carelessness, and such mistakes, arise from one or the other of these causes — result in the same way. Either or.both produce suffering and sometimes death. ' And can it be that if a physician should prescribe for a slightly ailing patient a small quantity of calomel and soda, and the druggist were to substitute arsenic for soda,- that he could shield himself from the consequence which might result by saying, if the prescription was compounded by himself, that it was a mistake, and, if the act of'his servant, that he could not have prevented it? The law does not place a community in the position of being poisoned by mistake, with no one to be held responsible therefor. If it was the master who did the wrong, the master is responsible. If it was his servant who did it, he is still responsible, for the master is responsible for the acts of *843 his servant when done in the course of his usual employment.”
From 2 Kent, 588:
“Every man is presumed to possess the ordinary skill requisite to the due exercise of the art or trade which he assumes. Spondet peritiam artis, and imperitia culpas annumeratur” — citing Digest 19, 2, 25, 7.
From Pothier, Vente, § 214:
“There is a case where the vendor, although he was entirely ignorant of the vice of the thing sold, is nevertheless bound to repair the damage which this vice may have caused the vendee in his other- property; it is the case where the vendor is a workman or a merchant who sells the fabrications of the art or trade of which he makes profession. Such workman or merchant is bound to repair whatever damage the buyer may have suffered from the vice of the thing sold in putting it to the use for which it was intended, even if such workman or merchant should pretend to have been ignorant of said vice.
“The reason is that a workman, by reason of the profession which he makes of being skilled in his craft, spondet peritiam artis (makes the solemn promise, or gives the solemn pledge, of his proficiency in his art). He renders himself responsible towards all those who contract with him, for the things he makes being fit for the use to which they are naturally destined. His unskillfulness or lack of knowledge in all that concerns his art is a fault which is imputed to him, as no one should publicly make profession of an art if he is not possessed of all the knowledge necessary for exercising it well; imperitia culpes annumeratur (incompetency is reckoned a fault). Dig. L. 132, Reg. Juris.”
From Dalloz, Codes Annotes, art. 1645, Nos. 15, 16:
“But there is an hypothesis under which the purchaser will not be required to make this proof” (the proof that the vice was apparent, or that the vendor had knowledge of it). “It is where, by reason of the profession which he exercises, the vendor should have known even the hidden defects of the things he sells.
“Thus, even though the vendor was ignorant of the vices of the thing sold, if by his profession he was bound to know them, he is in fault and ought to indemnify the purchaser for the damage suffered; good faith does not exclude incompetency” — citing Aix, 4 Jan. 1872, Dalloz & Journal du Palais, 1873, pt. 2, p. 55; Troplong, Vente, vol. 2, No. 574; Duvergiez, Vente, vol. 1, No. 412; Aubry & Rau, Vente (4th Ed.) vol. 4, No. 355, bis. p. 389; Gouillouard (3d Ed.) vol. 1, No. 462; Baudry-Lacantinerie & Saignat, Vente, No. 436.
This last reference, loe eit., reads as follows:
“However, it is generally conceded that the vendor is presumed to know the vices of the thing sold when he is a workman or manufacturer selling the things of his own fabrication; he ought to know their defects, and, if he makes the sale without revealing these defects to the purchaser, he ought to repair the damage which the latter may suffer therefrom; he ought to know what he sells, since it is his own production, and, if he does not know it, there is on his part an incompetency which is a professional fault whereby he is rendered responsible for the damage.”
See George v. Shreveport Cotton Oil Co., 114 La. 498-505, 38 South. 432, for a citation from Laurent to same effect.
From Troplong, Vente, art. 1647, C. C. No. 574:
“The workman or merchant who sells fabrications of their craft or commerce are assimb lated to the person who knows the vices of the thing he sells, and who by the vice of the thing sold has caused damage to the purchaser.”
In the case of George v. Cotton Oil Co., supra, this court had occasion to affirm the doctrine that a manufacturer is conclusively presumed to have known the defects of the things of his own manufacture which he has sold.
That doctrine is well recognized at common law. Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 3 Sup. Ct. 537, 28 L. Ed. 86.
It can be considered to be also well settled at common law that the vendor of articles of food for consumption by the purchaser warrants their wholesomeness. This is shown by the following excerpts:
From Addison on Contracts (Morgan Ed.) p. 218, § 621:
“Every victualer and dealer in provisions who sells provisions impliedly warrants them to be wholesome and fit for food. If I come to a tavern to eat, and the taverner gives me and sells me meat and drink corrupted, whereby I am made sick, an action lies against him without any express warranty, because it is a warranty in law.”
*845 And in a note to the above:
“In case of provisions it will be presumed that the vendor intended to represent them as sound and wholesome, because the very offer of the articles for food for sale implies this, and it may readily be presumed that a common vendor of articles of food, from the nature of his calling, knows whether they are unwholesome and unsound or not. From the fact of their being bad, therefore, a false and fraudulent representation may readily be presumed. But these reasons do not apply to the case of provisions packed, inspected, and prepared for exportation in large quantities as merchandise” —per Shaw, G. J., in Winsor v. Lombard, 18 Pick. (Mass.) 57.
And see French v. Vining, 102 Mass. 132, 136, 3 Am. Rep. 440; Van Bracklin v. Fonda, 12 Johns. (N. Y.) 468, 7 Am. Dec. 339; Marshall v. Peck, 1 Dana (Ky.) 612; Humphreys v. Comline, 8 Blackf. (Ind.) 516; Moses v. Mead, 1 Denio (N. Y.) 378, 43 Am. Dec. 676; Hoover v. Peters, 18 Mich. 51; Divine v. McCormick, 50 Barb. (N. Y.) 116; Davis v. Murphy, 14 Ind. 158; Osgood v. Lewis, 2 Har. & G. (Md.) 495, 18 Am. Dec. 317; Emerson v. Brigham, 10 Mass. 197, 6 Am. Dec. 109. It has been held that there is no implied warranty in selling provisions as articles of merchandise, to one to sell again. Winsor v. Lombard, 18 Pick. (Mass.) 57; Moses v. Mead, 5 Denio (N. Y.) 617; Hart v. Wright, 17 Wend. (N. Y.) 267; Emerson v. Brigham, 10 Mass. 197, 6 Am. Dec. 109. From 22 L. R. A. 194, note:
. “In the case of the sale of articles of food to be consumed directly in domestic uses, there is as between the dealer and consumer an implied warranty that such articles are sound and wholesome” — citing a long list of cases.
From the note to Sheffer v. Willoughby, in 52 Am. St. Rep. 483:
“A public caterer emploj'ed to furnish refreshments at a public hall is liable for any injury suffered by one attending by reason of unwholesome provisions furnished by him. Bishop v. Weber, 139 Mass. 411 [1 N. E. 154], 52 Am. Rep. 715. In the sale of provisions for domestic use there is an implied warranty thatx they are sound and wholesome. Van Bracklin v. Fonda, 12 Johns. [N. Y.] 468, 7 Am. Dec. 339, and note.”
It will be noted from the foregoing that the vendor of food to be consumed by the purchaser is conclusively presumed to know the condition of the food he sells, and • to represent to the purchaser that such food is wholesome. In other words, the representation which he is thus presumed to make to the purchaser is not merely that he has been careful in the selection, preparation, and preservation of the food, but that the food is, as a matter of fact, wholesome. When, therefore, the food proves to be unwholesome the warranty is breached, and he is responsible.
Excerpts Bearing Upon the Measure of Damages.
From Mourion, arts. 1645, 1646:
“A dealer in barrels has sold you a barrel that was defective, but he was ignorant of the defect. He is not guilty of fraud, but he is in fault; for one can easily ascertain the qualities and defects of the things the dealing in which constitutes one’s business. In such a case, the vendor owes, in addition to the restitution of price, the damages foreseen, or which could easily have been foreseen, at the time of entering into the contract; for example, the loss of the wine which you have put in the barrel. But he does not answer for those damages that could not have been foreseen at the time of the contract. So that, if you have put into the barrel a liquor of great value, he owes you only an indemnity equal to the value of. ordinary wine to which the barrel was naturally destined.”
From Pothier, Obligations, No. 162, Evans’ Translation:
“Sometimes the debtor is liable for the damages and interests of the creditor,^ although extrinsic; which is the case when it appears that they were contemplated in the contract, and that the debtor submitted to them either expressly or tacitly, in ease of the nonperformance of his obligation. For instance, I sell my horse to a canon, and there is an express clause in the agreement, by which I am obliged to deliver it to him, so that he may arrive at the place of his benefice in time to be entitled to his revenues. If in this case I make default, in dischárging my obligation, though without any fraud, and the canon could not either get another horse or any other conveyance, I shall be answerable even for the extrinsic damages arising from the loss of his revenues; for *847 by the clause of the agreement the risk of this damage was foreseen and expressed, and I am deemed to have taken it upon myself.
“So if I let my house to a person in his quality as a tradesman, or for the purpose of being used as an inn, and the tenant, is evicted, the damages and interests, for which I am answerable to him, will not be confined to the expense of removal, and the Advance of rents, as in the former instance. The loss of custom, if he cannot meet with any other suitable house in the neighborhood, ought also in some degree to be taken in the account; for having let my house for the purpose of a shop, or an inn, this kind of damage is one whereof the risk is foreseen, and to which I am considered as having tacitly submitted.
“The following is another instance of this distinction: A person sells me some pieces of wood, which I have used to prop my building, and on account of the insufficiency of the props, the building gives way. If the seller was not a person acting in the course of his business, and had fairly sold me these pieces of wood without knowing of their defect, the damages and interests would only consist in a reduction of the price on account of my having given him too much, by buying the wood as good, which was defective, and will not extend to the loss arising from the failure of the building. For the seller who sold me the wood fairly, and who was not obliged to know any more of it than I, is not deemed to have undertaken this loss. L. 13. ff. de act. empt.
“But if the person who sold me these props acted in the course of his business, and was a carpenter, selling them for the purpose of supporting my building, he will be answerable for my damages and interest arising from the building giving way on account of the insufficiency of the props, and will not be permitted to allege that he thought they were good and sufficient; for, admitting what he says to be true, this ignorance on his part would not be excusable in a person making a public profession of an art; for in this case imperitia culpas annumeratur, 1. 182. ff. de. R. 1. In selling me these props, and selling them in his quality of a carpenter, he is held to render himself responsible for their sufficiency, and to have subjected himself to the risk of my building, if they were not so. Melin. tract, de eo quod interest, N. 51.”
In the case of Aix, Jan. 1872, Dalloz, Juris. Gen. & Journal du Palais, 1873, pt. 2, p. 55, cited supra, in support of the extract, supra, from Dalloz, Codes Annotés, the court held a merchant who had sold a gun was responsible for the damage caused to the purchaser by the explosion of the gun. Prom a most learned note to the report of said decision, in Dalloz, we extract the following:
“It is impossible not to consider the accident caused by the explosion of the gun as a damage flowing directly from the fault of the seller of the gun.”
From 35 Oyc. 443:
“The buyer may show not only the diminished value of the goods, but also damage suffered by the breach (of the warranty) in excess of the seller’s claim.”
From the decisions of the Court of Appeals of New York in the case of Milburn v. Belloni, 39 N. Y. 53, 100 Am. Dec. 403:
“In the recent case of Passinger v. Thorburn, 34 N. Y. 634 [90 Am. Dec. 753], all the cases are reviewed by Judge Davies. There the defendant had sold a quantity of cabbage seed, and had warranted that it would produce Bristol cabbage. It turned out to be seed of an inferior quality, and the crop produced was of little value. Under the ruling of the judge, the jury gave the plaintiff as damages the value of the crop as it would have been if of Bristol cabbage, as ordinarily produced that year, deducting the expense of raising the crop, and deducting the value of the crop actually raised thereupon. This principle was sustained in this court. The case of Smeed v. Foord, 102 Eng. Com. Law, 612, laid down the rule that the plaintiff was entitled to recover the damages which are the natural consequence of the breach of the contract. A machine to be used for threshing wheat was not delivered at the time agreed upon, in consequence of which the wheat was stacked' and afterward injured by the rain. This injury, and the loss and expense which it involved, were held to be the natural results of the -defendant’s delay.
“In Borradaile v. Brunton, 8 Taunt. 535, the loss of the anchor was held to be a natural result of the insufficiency of a cable sold for holding an anchor and warranted to last for two years.
“In Brown v. Edgerton, 2 Man. & C. 279, the loss of a pipe of wine by breaking of a rope attached to a crane, sold for that use, was held to fall properly within the scope of damages for selling an insufficient rope to be used upon such crane.”
From Parsons on Contracts (8th Ed.) vol. 1, p. 616, § 593:
“The general rule for the amount of damage would be the price paid’ if the thing bought were returned. If not, it would be the difference between the price paid and the actual value. But if further damage resulted directlv from the breach of warranty, that too would be recovered. Thus one selling coal dust to be used in making brick, and warranting it free from soft coal, was held responsible for the damage done to the bricks by the soft coal dust in that which was sold. Milburn v. Belloni, 39 N. Y. 53 [100 Am. Dec. 403].”
*849 From 15 A. & E. E. oí Law, 1259:
“While the ordinary measure of damages applying to warranties of personal property is the difference between the actual value of the articles sold and their value if they had been such as warranted, additional damages may be recovered for breach of the implied warranty of quality if they are such as may be fairly supposed to have entered into the contemplation of the parties when they made the contract, when they are such as might naturally be expected to follow its violation, and where they are capable of being definitely ascertained.”
It is therefore ordered, adjudged, and decreed that the judgment of the Court of Appeal he affirmed. Defendant to pay all costs.