203 So.2d 764 (1967)
Howard C. ARNOLD, Plaintiff-Appellant,
v.
UNITED STATES RUBBER COMPANY, Defendant-Appellee.
No. 2114.
Court of Appeal of Louisiana, Third Circuit.
October 27, 1967.
Rehearing Denied November 27, 1967.
*765 Neblett & Fuhrer, by Robert B. Neblett, Alexandria, for plaintiff-appellant.
Gist, Methvin & Trimble, by David Hughes, Alexandria, for intervenor-appellee-appellant.
*766 Provosty, Sadler & Scott, by LeDoux R. Provosty, Jr., Alexandria, for defendant-appellee.
Before FRUGE, HOOD and LEAR, JJ.
HOOD, Judge.
This is a suit for damages for personal injuries sustained by plaintiff, Howard C. Arnold, when a fire hose manufactured by defendant, U. S. Rubber Company, burst or exploded while it was being tested. Hartford Accident and Indemnity Company intervened, claiming reimbursement for workmen's compensation benefits paid to plaintiff because of the injuries he received in the accident. The case was tried by jury and a verdict was returned for defendant. Judgment was rendered in accordance with that verdict, and plaintiff has appealed.
During the early part of the year 1965, the Alexandria Fire Department requisitioned from the City of Alexandria ten 50-foot links of two and one-half inch fire hose. The city forwarded the order to the Eureka Fire Hose Division of the U. S. Rubber Company, and in response to that order the hose was delivered to the Fire Department early in March, 1965. The type of hose which was ordered and delivered is commonly known as "600 pound test" hose, and stenciled on the hose in bold letters were the words, "TESTED TO 600 POUNDS."
Several days after the receipt of this hose, a crew of firemen, including plaintiff, attempted to perform a pressure test on the new hose under the supervision of the assistant fire chief. To conduct this test the fire hose was made up into five 100-foot links, and a standard fire hose nozzle was attached to the end of each of these links. The other end of each 100-foot link was then connected to the discharge outlets of a fire engine pumper, utilizing two discharge valves on each side of the pumper and one value at the rear. The rear link of hose was laid out in a straight line, extending behind the truck from the rear valve. Each of the other 100-foot links was attached to a side valve of the pumper, and the hose was laid out so that it extended a distance of about eight feet from the side of the truck, and then it was bent or curved to the rear so that the remainder of the hose extended toward the rear of the truck. There was a bend or curve, therefore, in four of the five links of hose as the test was being made.
The hoses were then filled with water, the nozzles were closed, and the fire truck engine was operated at full throttle in an attempt to raise the pressure in the hose to 600 pounds. Although the pumps were run at full throttle, the pressure gauge registered no more than 570 pounds, so the pressure was reduced and a cursory inspection was made to determine the reason why 600 pounds of pressure could not be attained. A second attempt was then made, and while the gauge again was registering 570 pounds of pressure one of the links of hose which was attached to a side valve on the pumper ruptured, causing the hose to whip around and to strike and injure plaintiff who was standing in that vicinity. The rupture in the hose occurred at a point about eight feet from the side of the pumper, at a place where the link of hose was bent or curved. On each of these attempts the pressure of 570 pounds was maintained for about one full minute. On the second attempt pressure was maintained at that point for one minute immediately before the hose burst.
Plaintiff based his claim for damages on breach of warranty, express or implied, and on the negligence of defendant in manufacturing and marketing a defective hose. He contends that the hose was warranted to withstand a water pressure of up to 600 pounds per square inch, that because of vices and defects in it the hose would not withstand that pressure, that defendant was negligent in manufacturing and selling a defective hose and in failing to warn persons using it of the danger of bursting, and that the defect in the hose caused him to *767 sustain the injuries for which he claims damages.
A manufacturer or seller of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part sustains an injury caused by a defect in the design or manufacture of the article, if the injury might have been reasonably anticipated. Meche v. Farmers Drier & Storage Company, 193 So.2d 807 (La.App. 3d Cir. 1967, Writ refused); Smith v. New Orleans and Northeastern Railroad Company, 153 So.2d 533 (La.App. 1st Cir. 1963); Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4th Cir. 1962).
We will assume for the purpose of this suit, without determining the issue, that a fire hose is a product which involves a risk of injury to the user. Even with that assumption, in order for plaintiff to recover he must show, among other things, that there was a defect in the design or manufacture of the hose. An important factual issue is presented, therefore, as to whether the hose was defective.
The evidence establishes that this hose had been factory tested at 600 pounds of pressure before it was shipped to the Alexandria Fire Department, and that the hose had withstood that pressure. The statement on the hose that such a test had been made, therefore, was correct.
The evidence also shows that there are at least two kinds of pressure tests to which a hose may be subjected. One is the "proof pressure test" and the other is the "annual service test," the former being for use on a new hose and the latter being for use on an old or used hose. The procedure recommended by the National Board of Fire Underwriters and used by the manufacturer for conducting a "proof pressure test" is to lay the hose out in a straight line on a test table, with the nozzle higher than the intake, and to then apply the specified pressure for a period of no longer than five seconds. Usually the hose is strapped to the test table to prevent it from whipping around and causing injury in case of a rupture. Very few fire departments are equipped with the type test table which is required for making such a test, and the Alexandria Fire Department had no such equipment. The "annual service test" is made under conventional testing conditions, such as those used in this instance, but in making this type test not more than 250 pounds of pressure is applied to the hose.
The expert testimony also shows that when pressure is applied to a hose which is curved or bent, an unusually high pressure develops at the point of the curve where the hose fabric itself becomes stretched. It is for that reason that the hose is always laid in a straight line when a proof pressure test is made. The record also shows that ordinarily where a fire department which does not have the proper equipment undertakes to conduct a "proof pressure test," using conventional as opposed to factory simulated methods, a maximum pressure of not more than 400 pounds per square inch is applied to a 600 pound test hose.
The clear weight of the evidence is that in practical use for fire fighting purposes a fire hose is seldom, if ever, subjected to more than 200, or perhaps 250, pounds of pressure. A hose which will withstand pressure up to that point, therefore, is suitable and adequate for dealing with almost any conceivable type of fire fighting assignment.
In the instant suit, the Alexandria Fire Department undertook to perform a "proof pressure test" on this fire hose without following the recommended procedure for conducting such a test. It did not have a test table, the hose was laid out with a curve in it instead of being straight, the nozzle was lower than the discharge valve instead of being elevated above it, and high pressure was applied to the hose twice for periods of more than five seconds on each occasion. Under these circumstances we *768 conclude that the evidence fails to establish that there was a vice or defect in the hose.
We find no merit to plaintiff's argument that there was a breach of warranty by defendant. Defendant stipulated that the warranty on the hose was 600 pounds per square inch of hydrostatic pressure. We think this warranty, however, was that as a new hose it would withstand that pressure under a proof pressure test conducted in the manner prescribed by the National Board of Fire Underwriters. The defendant did not warrant that the hose would withstand 600 pounds of pressure under any circumstances. The evidence shows that it did withstand that pressure under a test which was properly administered, and thus the representation or warranty was satisfied. We cannot agree with plaintiff that defendant was under a duty to warn a user of the hose that it might burst or rupture if tested at high pressure, using conventional rather than the recommended procedures for conducting such a test.
Plaintiff urges three additional grounds on which he contends that the jury verdict and the judgment of the trial court should be reversed. He argues, first, that the trial court erred in refusing to allow him to take the discovery depositions of the defendant's expert witnesses. The record shows that the defendant called two expert witnesses. The names of these two experts were given to plaintiff at least ten days before the date scheduled for the trial. Plaintiff made no effort to take their discovery depositions, however, until after the trial had begun. During the first or second day of the trial he had subpoenas served on these two witnesses directing them to appear before a notary to take their depositions after court adjourned for the day. The defendant objected to the taking of the depositions at that time, and the trial court sustained the objection.
LSA-C.C.P. art. 1451 provides that "A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the action * * *" And, LSA-C.C.P. art. 1452 provides, in part, "* * * upon motion seasonably made by any party or by the person to be examined and upon notice and for good cause shown, the court in which the action is pending may order that the deposition shall not be taken * * *" The trial judge, of necessity, must be vested with a great deal of discretion in limiting the right of parties to take discovery depositions. Dawson v. Lindsey, 143 So.2d 150 (La.App. 1st Cir. 1962).
In this instance we think the plaintiff failed to give seasonable notice of his desire to take the depositions. Also, the witnesses were present in court, and they were available so that plaintiff could confer with them. Under those circumstances, and in view of the fact that the trial had already begun, good cause was shown for the trial court to order that the depositions should not be taken. We conclude that there was no abuse of discretion on the part of the trial judge in refusing to permit plaintiff to take these depositions.
Plaintiff argues next that some of the instructions given to the jury were incomplete, confusing and incorrect. The record indicates, however, that no objection was made by plaintiff to any of these instructions before the jury retired to consider its verdict.
LSA-C.C.P. art. 1793 states, in part: "A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection." Also, if the trial judge had been convinced that a miscarriage of justice had resulted, he had the right in his discretion to order a new trial. LSA-C.C.P. arts. 1971, 1973; Renz v. Texas and Pacific Ry. Co., 138 So.2d 114 (La.App. 3d Cir. 1962, Cert. denied).
*769 Since plaintiff did not object to the instructions which were given to the jury before the jury retired to consider its verdict, we feel that he must be held to have waived any objections which he may have had to those instructions. See Renz v. Texas and Pacific Ry. Co., supra; Katz v. Insurance Company of North America, 150 So.2d 879 (La.App. 4th Cir. 1963, Cert. denied).
Lastly, plaintiff argues that the doctrine of res ipsa loquitur should be applied in this case. In Pilie v. National Food Store of Louisiana, Inc., 245 La. 276, 158 So.2d 162 (1963), our Supreme Court said "each case must be decided on its own facts and circumstances, and * * * res ipsa loquitur will not be applied unless the facts and circumstances indicate that the negligence of the defendant, rather than the negligence of others, is the most plausible explanation of the accident." See also Fruge v. Trahan, 194 So.2d 478 (La.App. 3d Cir. 1967). For the doctrine of res ipsa loquitur to apply in an action of this kind, the instrumentality causing the injury must be in the possession and control of the defendant at the time of the injury, or if such be not the case, plaintiff must show freedom from negligence by those into or through whose hands the instrumentality has passed. Plunkett v. United Electric Service, 214 La. 145, 36 So.2d 704 (1948); Eversmeyer v. Chrysler Corporation, 192 So.2d 845 (La.App. 4th Cir. 1966). In view of our determination, among other findings, that defendant did not have control of the hose at the time of the accident, and the fact that plaintiff did not show that the Alexandria Fire Department was free of negligence, we conclude that the doctrine of res ipsa loquitur is not applicable in this case.
Since the evidence fails to show negligence on the part of defendant, and it fails to establish that there was any vice or defect in the fire hose, we conclude that the jury did not err in returning a verdict for the defendant. Begnaud v. Texas and New Orleans Railroad Company, 136 So.2d 123 (La.App. 3d Cir. 1961, Cert. denied).
For the reasons herein set out, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.