Nettie Lee Fontenot SOILEAU, Ind. and as Natural Tutrix of minors Donald Ray, James Randall, Romona Cynthia Marie, Patrick and Charles Soileau

v.

NICKLOS DRILLING COMPANY et al.

Civ. A. No. 12064.

United States District Court
W. D. Louisiana,
Opelousas Division.

March 28, 1969.

DeVillier & Ardoin, J. Winston Ardoin, and Jacque B. Pucheu, Eunice, La., for plaintiffs.

Adams & Reese, Sam A. LeBlanc III, New Orleans, La., for Nicklos Drilling Co. and Union Oil Co., cross-claimant.

Breazeale, Sachse & Wilson, Boris F. Navratil, Baton Rouge, La., for Unit Crane & Shovel Corp.

## MEMORANDUM OPINION

PUTNAM, District Judge.

On January 17, 1966, Lanson Soileau, husband and father of the petitioners, was killed when a crane manufactured by Unit Crane and Shovel Company (Unit), mounted on a pedestal on a fixed oil well drilling platform, toppled from its base and fell into the Gulf of Mexico. The platform was located on the outer continental shelf, off the Louisiana coast.

Plaintiffs sued Union Oil Company of California (Union), owner and operator of the platform, Nicklos Drilling Company (Nicklos), Boehck Engineering Company, Inc., distributor and Nicklos' immediate vendor, and Unit. The suit against Nicklos (Under the Jones Act)

was dismissed when it was determined that Soileau was employed by that defendant, and that plaintiffs' original belief that the structure in question was a submersible drilling barge was erroneous. Boehck Engineering Company, Inc. was also dismissed by agreement of the parties.

Trial proceeded under the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., and Article 2315 of the Louisiana Civil Code, which is the wrongful death statute of this State.

Nicklos cross-claimed in maritime tort against Unit for the value of the crane and certain drilling supplies, lost when the crane fell into the gulf. Union cross-claimed against Nicklos under an indemnity provision of its drilling contract, as well as against defendant Unit. Nicklos assumed Union's defense, and the litigation finally resolved itself into a suit between Mrs. Soileau and her six minor children and Nicklos, on the one hand, and Unit on the other.

Prior to the trial the Soileau claims under Article 2315 of the Louisiana Civil Code were dismissed, following the decisions in Dore v. Link Belt Company, 391 F.2d 671 (5 Cir. 1968), and Rodrigue v. Aetna Casualty & Surety Co., 395 F.2d 216 (5 Cir. 1968). Since writs were issued by the Supreme Court in these cases, 393 U.S. 932, 89 S.Ct. 295, 21 L.Ed.2d 268 (1968), the court reinstated these demands to avoid the necessity of an additional trial in the event they are overruled. We have, accordingly, made separate determinations of plaintiffs' damages for loss of love and affection under Article 2315, in addition to pecuniary losses under the Death on the High Seas Act.

The evidence preponderates to the effect that at the time of the accident Soileau was unloading heavy crates of drilling supplies from the M/V Florida, a supply vessel alongisde the platform. He was using a No. 1525–U crane manufactured by Unit, with a sixty-three-foot boom. It was put into service in April, 1964. During its working life on the

platform it was regularly maintained by the crane operators and other Nicklos personnel. It was manufactured and sold for use in the offshore oil industry. There is no evidence in the record showing that it was not satisfactory for this work, except for the accident in question.

Soileau had gone on duty only fifteen or twenty minutes before the tragedy occurred. He was an experienced crane operator, familiar with this crane, having been so employed for approximately fifteen months. The cargo he attempted to lift was a rack of one-inch "spaghetti" pipe, of a stipulated weight of 20591 pounds.

The deckhand (Valentine) who attached the load on the supply boat to the hook did not have a clear recollection of events that morning. He testified that the boom angle was "between one and two o'clock" when the crane fell. Another deckhand (Ortego) said the boom was "almost straight up". The lift was smooth, and the pipe was approximately 70 feet in the air at the time. The Florida had pulled away and was forty feet off the platform. The crane hit the water approximately twenty feet from the boat. Another witness, K. C. Simmons, was on the platform handling a tag line attached to the rack of pipe to prevent it from twisting. He does not know the angle of the boom or the position of the boat when the lift was made, but he stated he was leaning over the platform railing from four to six feet from the crane pedestal, and the load was directly below him when the failure occurred.

Earlier that morning the Florida had been tied up to the platform port side to, using the port stern line. During the operation this line parted. The line fouled the port screw and thereafter the skipper maneuvered the ship into position by using the starboard engine and circling the platform. The deceased lowered the block and cable to a point some 30 to 35 feet above the water. When the vessel was in position the boom cable was brought down, the load secured, then taken up. The captain's

testimony is not clear as to the angle of the crane boom when the accident occurred. He stated that the port side of the vessel was from 6 to 8 feet off the legs of the platform, and that the pipe rack was to be lifted from the port side of the after deck. By proceeding forward on the starboard engine the bow of the vessel would have a tendency to swing to port, into the platform. By backing down to check her and hold her in position, even using the rudders, there would be a tendency to swing the bow to starboard away from the platform, and the stern in. Reference to the photograph of the platform marked "Unit 2" shows that the crane pedestal actually extends over the water and out from the edge of the platform several feet.

From the foregoing and other evidence in the record, we conclude that the lift was made from a distance of not more than fifteen feet from the center line of rotation of the crane, with a boom angle of approximately 82-½°. (See Exhibit P–9) The rated lifting capacity of this crane with the load fifteen feet from the center line of rotation is 31,450 pounds, with a safety factor of 15%. Even at twenty feet with a boom angle of approximately 74°, the rated capacity is 20,050 pounds, and with the 15% safety factor it is 23,057 pounds. The testimony of the deckhand Ortego, who saw the lift made after the hook was secured to the rack of pipe, is the most reliable and convinces us that the boom was, in fact, "almost straight up" when the accident occurred. According to exhibit P–9 when the boom is straight up (at 85°, or 5° off vertical) the hook will hang ten feet from the center line of rotation. With the skin of the ship six to eight feet from the platform (actually beneath the crane pedestal) considering that she had a 32-foot beam and the cargo being lifted was on her inboard side, the load distance could not have been greatly in excess of fifteen feet. The weight of the load then, was well within the crane's rated capacity.

Placing the cart before the horse, we must reject Unit's contention that its machine was subjected to a gross overload at time of failure, and with it the affirmative defense of contributory negligence.

The crane was recovered from the bottom of the Gulf. It was apparent that the right rear hook roller link had broken, causing it to topple over into the water. There was considerable expert testimony as to why this link failed, which we will not discuss in detail. It was manufactured of grade 87–C steel, cast by Crucible Steel Corporation to specifications of Unit, and according to literature from this foundry it should have had a minimum yield point of 91,-000 pounds, p.s.i., and a tensile strength of 120,000 pounds p.s.i. It was a critical part of the crane assembly. Due to an imperfect casting and poor welding at the foundry, the strength of the link in question was greatly reduced. As a result of the foundry welding processes, cracks in the cast link were not fully repaired and actually aggravated the imperfect condition of the link. The evidence further preponderates to the effect that Crucible Steel used an acetylene or gas welding process, made an incomplete weld, and did not properly heat treat the metal after welding, resulting in increased brittleness and less ductility. Stresses in the metal were concentrated at those points where the cracks were not fully repaired. The fracture was a brittle fracture, propagating almost instantaneously. As we observed at the conclusion of the trial, the court is unable to pinpoint any one circumstance or combination of circumstances, that existed on the day in question that immediately caused the failure, but fail it did, because of these defects. There is not, in our opinion, sufficient evidence from which we can reasonably conclude that the design of the link or of the hook roller assembly was defective or improper. The imperfect casting was the sole defect.

In this connection, the advertising brochure of Crucible Steel, Exhibit

P–22, is replete with representations of the high quality of its steel castings, and the radiography, X-ray, and magnetic particle inspection techniques exercised by it to detect defects and maintain quality control. It is emphasized that: "Attention is specifically given to high-quality castings which require special heat treatment and redesign work." These hook roller link assemblies were critical parts in the Unit Crane for which they were intended. The question of Unit's negligence is admittedly a close one. Unit exercised practically no quality control over these castings, relying upon Crucible Steel in this respect. There is no showing in the record that Unit's reliance upon its supplier was contrary to good industrial practices, or that it had any reason to believe that the castings were not as represented. We accordingly conclude that Unit was not negligent, although its reliance upon Crucible was clearly misplaced.

There is practically no dispute that: (1) the hook roller assemblies on the crane were placed in the machine at the factory and reached the purchaser without substantial change; (2) that the normal operating life of the hook roller link is in excess of two years in the absence of defects; (3) that the link in question, as well as the entire crane, was properly maintained by Nicklos; (4) that the hook roller link is a crucial operating component of the No. 1525–U crane, upon which the safe use of the machine depends.

Due to the defects in this particular link as outlined above, the molecular structure of the steel was adversely affected and its strength reduced. In this condition, the crane was potentially dangerous to the life and property of those who could foreseeably be expected to use it. The danger to the operator under all of the circumstances of this case was so great as to constitute an unreasonable risk. It was a constant, invisible and virtually undetectable threat to those in its vicinity when put to its intended use.

■ This fixed platform, attached to are applicable and not inconsistent with the seabed of the Gulf of Mexico, was not a vessel in navigation. By the express provisions of the Outer Continental Shelf Lands Act it is an artificial island. 43 U.S.C.A. § 1333(a) (1). Torts occurring on such fixed structures and artificial islands have uniformly been regarded as maritime, and federal maritime law has been applied to litigation resulting therefrom. Pure Oil Co. v. Snipes, 293 F.2d 60 (5 Cir. 1961); Ocean Drilling & Exploration Co. v. Berry Bros. Oilfield Service, 377 F.2d 511 (5 Cir. 1967); Movible Offshore Co. v. Ousley, 346 F.2d 870 (5 Cir. 1965); Loffland Brothers Company v. Roberts, 386 F.2d 540 (5 Cir. 1967), cert. den. 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968), are but a few of the legion of cases decided on this basis. In Louisiana at least one appellate court in a well-reasoned opinion has reached the conclusion that the courts of this state have no jurisdiction over such structures on the outer continental shelf. Gravois v. Travelers Indem. Co., 173 So.2d 550 (La.App.1965).

It came as no surprise, therefore, when it was held that the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., was the exclusive remedy afforded survivors of an offshore workman killed in an industrial accident occurring on such a platform. Dore v. Link Belt Company, supra, was the landmark case in the Fifth Circuit on this point. The decision is consistent with prior jurisprudence dealing with maritime injuries short of death; it insures the uniformity of maritime law and a certain degree of stability in the contractual relationships of those engaged in the offshore oil industry and other enterprises on the shelf in the controlled development of the natural resources found there.

Considerable speculation now exists as to the conclusions reached in *Dore*, as a result of the writs issued by the Supreme Court which we have mentioned above. The Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1333(a) (2)

provides that "To the extent that they * * * [the Act] or with other Federal laws * * * the civil and criminal laws of each adjacent State as of August 7, 1953 are declared to be the law of the United States for * * * artificial islands and fixed structures erected thereon * * *, if such structures would be included in the area of the State if its boundaries were extended seaward to the outer margin of the shelf. Whether or not the Death on the High Seas Act is the exclusive remedy for Mr. Soileau's survivors, or whether the statutory provision above quoted makes Article 2315 of the Louisiana Civil Code (which is the Louisiana wrongful death statute) applicable, will be decided by the Supreme Court in its review of *Dore* and *Rodrigue*, supra.

However, in the view which we take of this case it would make no difference in the outcome if we apply the Death on the High Seas Act or Article 2315 of the Louisiana Civil Code, except in the measure of damages recoverable for Mr. Soileau's death. In addition to pecuniary losses, these DOHSA plaintiffs would be entitled to damages for loss of love and affection of their deceased husband and father. As we shall see, Louisiana law holds a manufacturer to strict liability in tort for damages caused by his defective products, as does the common law.

■ It is now widely recognized that one who manufactures and sells a chattel tainted with a defect of such nature as to render the product unreasonably dangerous to the person or property of those who might reasonably be expected to consume or use it, is liable *in tort* for breach of his special responsibility to the public to see to it that the product is fit for its intended use, regardless of the exercise of all possible care in the manufacturing process. The historical development of this theory of strict liability in the common law has been the subject of much legal writing. The rule that has evolved is, we think, fairly stated in Section 402A, Restatement of the Law, Torts Second, as follows:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The rapid evolution of the rule is traced with exhaustive references in the cases of Lartigue v. R. J. Reynolds Tobacco Company, 317 F.2d 19 (5 Cir. 1963); Ford Motor Co. v. Mathis, 322 F.2d 267, 3 A.L.R.3d 1002 (5 Cir. 1963); and Putman v. Erie City Mfg. Co. et al., 338 F. 2d 911 (5 Cir. 1964).

*Lartigue* deals with Louisiana concepts under the civil code and is especially appropriate here. The case dealt with the injurious effects of cigarettes manufactured by the defendant upon the health of plaintiff's husband, who died of lung cancer. It was decided prior to the revision of the Restatement of Torts Second, supra, and the discussion is confined to Louisiana cases dealing with food and drugs, or articles intended for intimate bodily use by the consuming public, to which the rule of strict liability was then confined. Article 2315 of the Louisiana Civil Code provides that "Every act whatever of man that causes damage to another obliges him by whose *fault* it happened to repair it." Judge Wisdom, with customary thoroughness,

expands upon the civilian concept of fault as used in this article of the code. He states the Louisiana rule as follows:

"In Louisiana under Articles 2315 and 2316, as in other states, a manufacturer of an injurious or defective product is liable to a consumer, when he fails to use due care in manufacturing a product. *In the case of decayed foodstuffs or food products containing deleterious substances, the manufacturer is held to strict liability, without regard to negligence.* Such liability is not inconsistent with the civilian requirement of 'fault'. Delictual responsibility without dolus (wilful harming) or culpa (negligent harming) is explainable in terms of presumption of fault. Stone, Tort Doctrine in Louisiana: The Concept of Fault, 27 Tul.L.Rev. 1, 14, 19 (1952). *Delicts (torts) do not have to depend on negligence. In the Civil Code, as in the common law, there are a number of instances of strict delictual liability when the law conclusively presumes fault notwithstanding the fact that the party liable did not will the damage and was not personally negligent.*" (317 F.2d 19, at 30, 31. Emphasis supplied.)

The court cited Doyle v. Fuerst & Kraemer, Ltd., 129 La. 838, 56 So. 906, 40 L.R.A.,N.S., 480 (1911); Mayerhefer v. Louisiana Coca-Cola Bottling Co., 219 La. 320, 52 So.2d 866 (1951); and LeBlanc v. Louisiana Coca Cola Bottling Co., 221 La. 919, 60 So.2d 873 (1952), among other food cases, as demonstrating the present tendency of the Louisiana Supreme Court to view the question as one of tort liability rather than contractual warranty as some of the earlier decisions indicated.

In Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4 Cir. 1962), not a food products case, the court cited and relied upon the earlier decision of Gordon v. Bates-Crumley Chevrolet Company et al., 158 So. 223 (La.App. Cir. 1935), and held the manufacturer of a defective automobile liable in tort to the

purchaser, while dismissing the dealer-retailer. These cases turn upon the theory of imputed negligence, based upon constructive knowledge of the manufacturer of the defects in the machine fabricated and marketed by him, rather than the seller's warranty against redhibitory vices in the thing sold giving rise to liability as provided in Articles 2522, 2531 and 2545 of the Louisiana Civil Code. The recovery allowed in *Samaha* against the manufacturer of the automobile in question is clearly in tort, with fault being presumed. The retailer was released from liability under the articles on redhibition, which apply only to the relationship of vendor and vendee flowing from the sale itself.

In the more recent cases of Meche v. Farmers Drier and Storage Company, 193 So.2d 807 (La.App. 3rd. Cir. 1967), writs refused March 10, 1967, and Arnold v. United States Tire and Rubber Company, 203 So.2d 764 (La.App. 3rd. Cir. 1968), the rule is stated thus:

"A manufacturer or seller of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part sustains an injury caused by a defect in the design or manufacture of the article, if the injury might have been reasonably anticipated." (193 So.2d at 811).

In *Meche*, the court dealt with an allegedly defective elevator manufactured by one of the defendants; in *Arnold*, with a fire hose that ruptured under pressure. And, in another food case, McCauley v. Manda Brothers Provisions Co., Inc., 202 So.2d 492 (La.App. 1st. Cir. 1968) the same rule of strict liability in tort was applied against the manufacturer of the tainted sandwich (not against the seller), while the doctrine was further extended to the manufacturer of sight glasses on a fluid level gauge used on a high pressure separator unit to test an oil well in Lafourche Parish in Penn. v. Inferno Manufacturing Corporation, 199 So.2d 210, (La.App. 1st.

Cir. 1967). It is important to note that in all of these cases there was no privity of contract between the plaintiff and the defendant manufacturer. There can be no contention that the court based its holding on a theory of contractual warranty, or that privity of contract is an essential element of plaintiff's claim. The remedy is purely delictual, based on an imputation of presumption of fault under Article 2315 of the Code, as stated in the above-quoted passage from the Lartigue case.

In Penn, supra, the Court went one step further and held that the manufacturer who assembled and marketed the gauge in question under its own name would be liable to the plaintiff for his injuries, even though the defective sight glass which exploded was manufactured by Corning Glass Company for Inferno Manufacturing Company as a component part of its final product. Again referring to the Restatement of Torts Second, Section 400, the same principle is announced, viz:

> "Selling as Own Product Chattel Made by Another
>
> One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer."

■ It is now the settled jurisprudence of Louisiana that there is a species of strict liability in tort based upon civil law concepts of fault and not circumscribed by considerations of negligence, or personal culpability, imposed upon manufacturers. This rule, with slight theoretical differences, reaches the same result as Sections 400 and 402A of the Restatement of Torts, Second, supra.

■■ The language of the Death on the High Seas Act conferring a right of action for pecuniary losses resulting from the death of any person "caused by wrongful act, neglect or default occurring on the high seas", 46 U.S.C.A. § 761, is broad enough to include all actions ex-delicto. It is not limited to torts based upon negligence. The death

of a seaman caused by unseaworthiness is included within its ambit. Symonette Shipyards Ltd. v. Clark, 365 F.2d 464, cert. den. 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (5 Cir. 1966); Doyle v. Albatross Tanker Corp., 367 F.2d 465 (2 Cir. 1966); Annotation 22 A.L.R.2d 852 et seq., and cases therein cited. Consequently, the Soileau beneficiaries can recover under DOHSA, and Nicklos in maritime tort, provided the principles expressed in §§ 400 and 402A of the Restatement of Torts, Second, are not inconsistent with admiralty law.

Counsel for defendant point to Noel v. United Aircraft Corporation, 204 F. Supp. 929 (D.Del.1962), which denied application of the theory of strict liability (or implied warranty as it is often called) to a death claim under DOHSA. The court in Noel, however, did not rule out the application of this doctrine for all time. Instead, it expressly recognized that when the rule became more settled it might well be incorporated into the maritime law, saying:

> "A state rule that is 'so widely accepted as to be construed as a part of the general law of torts' may be incorporated into admiralty, provided the rule is harmonious with the rest of admiralty law. Sieracki v. Seas Shipping Co., 149 F.2d 98, 100 (3d Cir. 1945)".

This is exactly what has happened in the short period of time that has elapsed since Noel was decided. The rule has been recognized and incorporated into the Restatement, and is an offshoot of the same principles applied in the Sieracki case by the Court of Appeals, to which the learned Judge in Noel made reference.

■ We believe the better view to be that expressed in Middleton v. United Aircraft Corp., 204 F.Supp. 856 (S.D.N.Y.1960), Montgomery v. Goodyear Tire and Rubber Co., 231 F.Supp. 447 (S.D.N.Y.1964), Sevits v. McKiernan-Terry Corporation, 264 F.Supp. 810 (S.D.N.Y. 1966) and Krause et al. v. Sud-Aviation, Societe Nationale, etc. No. 6010 C.C.H. Products Liability Reports (S.D.N.Y.

1968). Cf. Daws v. Movible Offshore, Inc., 264 F.Supp. 764 (E.D.La.1967), and see also Scott v. Eastern Air Lines, Inc., 399 F.2d 14 (3 Cir. 1968). For reasons elaborated upon in these decisions, we hold that the Death on the High Seas Act encompasses an action for the death of an offshore workman occurring on a fixed platform in the Gulf of Mexico as a result of a defective crane manufactured by defendant and sent from its factory in a condition such as to render it unreasonably dangerous to those persons who might foreseeably be injured in person or property when put to its intended use. In so holding, we adopt and apply the principles enunciated in the Restatement of Torts, Second, §§ 400 and 402A, insofar as they apply to the manufacturer of such a product, as a uniform statement of the rule now so generally accepted in the States as to permit it to be incorporated into federal maritime law.

█ Unit, therefore, would be liable to all plaintiffs for their damages under the maritime law, Death on the High Seas Act, or Article 2315 of the Louisiana Civil Code, the sole difference being in the measure of damages for the wrongful death of Mr. Soileau to be recovered by his survivors, under the facts of this case. We express no opinion as to the Louisiana rule applying to the liability of sellers or retailers of such products; we are concerned here only with the liability of a manufacturer to a consumer or user of its defective article.

Union Oil Company of California must be dismissed from this suit. There is absolutely no evidence against this defendant in the record, upon which its liability might conceivably be predicated.

## QUANTUM

Mr. Soileau was survived by his widow, Nettie Lee Fontenot, who was 27 years of age at the time of her husband's death, and by six children, Donald Ray Soileau, born October 6, 1955; James Randall Soileau, born April 3, 1957; Romona Soileau, born August 13, 1958; Cynthia Marie Soileau, born July 3, 1960; Patrick Soileau, born March 12, 1962; and Charles Soileau, born September 11, 1964. He earned approximately $800.00 per month. Maintaining a household and supporting and educating six children on this amount of money is difficult. At the time of his death, however, the deceased had acquired a home, an automobile, and provided a life insurance policy, which will pay $1200.00 to each child for college education. He owed his children the duty to support, maintain and educate them to age 21.

Fixing each survivor's pecuniary losses is difficult. Assuming an average cost of $75.00 per month per child, which includes medical, dental and other ordinary expenses of life, such as clothing, recreation, school needs, etc., gives us an average figure of $900.00 per child per year. There should be added to this $2200.00 per child for higher education, in addition to the insurance proceeds mentioned above.

Mrs. Soileau received approximately $100.00 per month or $1200.00 per year in support from her husband. Out of his salary he expended a like amount for his expenses and pocket money. She could reasonably expect to receive this sum or its equivalent during the remaining 42 years of her husband's life expectancy. In addition, the record supports a finding that they had already begun to accumulate some property, and, as we stated at the close of the evidence, over the years should have acquired a community estate of at least $25,000.00, of which she would be entitled to one half, or $12,500.00.

█ We find the pecuniary losses sustained by these parties as follows:

| | |
|---|---|
| Mrs. Nettie Lee Fontenot Soileau ................ | $62,900.00 |
| Donald Ray Soileau ........ | 12,100.00 |
| James Randall Soileau ..... | 13,000.00 |
| Romona Soileau .......... | 13,900.00 |
| Cynthia Marie Soileau ..... | 14,800.00 |
| Patrick Soileau .......... | 16,600.00 |
| Charles Soileau .......... | 20,200.00 |

These amounts should be discounted at the rate of 4% per annum to arrive at value on January 17, 1966, when the loss accrued.

Nicklos sustained property damages as a result of the failure of the crane which the parties have stipulated to be in the sum of $40,104.00.

■ We next direct our attention to the claims of Mrs. Soileau and her children for damages allowable under Article 2315 of the Louisiana Civil Code. Under that article plaintiffs would be entitled to damages for their loss of support, and for grief, anguish and loss of love, companionship and guidance as well. Louisiana does not permit a calculation of monetary losses based upon a life expectancy discounted to present value. Pennington v. Justiss-Mears Oil Company, 242 La. 1, 134 So.2d 53 (1961). However, our award for these losses would certainly not be less than the sums awarded to the widow and children under the Death on the High Seas Act, which we have calculated above. Assuming that they would not be more, if Article 2315 is a proper vehicle for recovery in this case, the amounts so awarded should be supplemented by adding thereto damages for grief, anguish and loss of love, companionship and guidance. At the conclusion of the trial the court stated orally that it would render judgment for these elements of damage, and fixed the amount at $40,000.00 for Mrs. Soileau, plus funeral expenses of $3788.65 paid by her, and $10,000.00 for each one of the six children. Under Article 2924 of the Code, legal interest is fixed at 5% per annum, and under LSA–R.S. 13:4203, interest on judgments in actions for damages "ex-delicto" shall attach from date of judicial demand. In this case suit was filed on June 6, 1966.

■ Counsel for Unit has filed a written objection to our rendering judgment on these claims at this time, by letter dated January 3, 1969. We believe that his position is correct, and now vacate the ruling made orally at the end of the trial. Plaintiffs' claims under Article 2315 will be held for determination pending decision of the question by the Supreme Court in Dore and Rodrigue, supra. But this should not affect our judgment on the claims under DOHSA as to which the decree to be entered herein shall be final, as there is no just reason for delay. F.R.Civ.P. Rule 54(b), 28 U.S.C.A.; Moore's Federal Practice, Vol. 6, § 54.34, p. 240.

This procedure may result in additional expense to the litigants if appeals are taken. However, we feel bound by the Dore case, and do not wish to speculate upon the final outcome.

All damages allowed Mrs. Soileau and her six children under the Death on the High Seas Act, and damages allowed Nicklos, shall bear prejudgment interest at the rate of five per cent. per annum, running from January 17, 1966, until paid. National Air Lines v. Stiles, 268 F.2d 400 (5 Cir. 1959); Geotechnical Corp. of Del. v. Pure Oil Co., 214 F.2d 476 (5 Cir. 1954); Canova v. Travelers Insurance Co., 406 F.2d 410, 5 Cir., January 29, 1969.

The parties will prepare an appropriate decree for signature in keeping with the views herein expressed, pursuant to Rule 9(e) of this Court. Previous decrees submitted are not appropriate, in view of our final conclusion as to the claims ·under Article 2315.*

* On June 9, 1969, the Supreme Court reversed the Rodrigue and Dore decisions, supra. Rodrigue v. Aetna Casualty and Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). Since this case is currently on appeal, we are without jurisdiction to take further action. Sykes v. United States (8 Cir. 1968) 392 F.2d 735, 738; Bush v. United Benefit Fire Insurance Company (5 Cir. 1963) 311 F.2d 893, 894; 9 Moore's Federal Practice, § 203.11 at 734.